## HAWTHORN ENVIRONMENTAL PRESERVATION ASSOCIATION et al.

v.

## William T. COLEMAN, Secretary of the United States Department of Transportation, et al.

### Civ. A. No. 76–581.

United States District Court,
N. D. Georgia,
Atlanta Division.

April 30, 1976.

---

Steven E. Fanning and George C. Rosenzweig, Farmer, Fanning & Potterfield, Newnan, Ga., for plaintiffs.

William D. Mallard, Asst. U. S. Atty., Roland F. Matson, Asst. Atty. Gen., Daniel M. Bennie, Asst. Regional Counsel, Federal Highway Administration, Dept. of Transportation, Atlanta, Ga., for defendants.

## ORDER

RICHARD C. FREEMAN, District Judge.

This is an action brought for declaratory and injunctive relief regarding the construction of a portion of the "Newnan Bypass", designated under the project No. PR–2177(4) and running from a point .7 mi. west of I–85 on Ga–34 (SR–34) to a point .3 mi. north of Newnan on US–29 (Ga–14 or SR–14), a total distance of 2.187 miles. *See* Appendix "A". Plaintiffs[1] seek a declara-

---

1. Plaintiff Hawthorn Environmental Preservation Association is described in the complaint as follows: "Plaintiff . . . is a nonprofit, community benefit unincorporated association located at Newnan, Georgia. . . . Its purposes are to promote the knowledge and enjoyment of the scenic, recreational, and aesthetic qualities of the Lake Hills Community and its enviorns [sic] in Coweta County, Georgia . . . .." On April 20, 1976, an amendment was filed adding six named individuals as party plaintiffs and adding a new substantive count VII to the complaint. This count alleges violation of the National Historic Preservation Act of 1966, 16 U.S.C. § 470; however, the parties to this action have not thoroughly briefed this issue at this time. Nevertheless, it appears that consideration of the historical, cultural, and archaeological significance of an area is relevant to the other substantive statutory requirements in issue; therefore consideration of the further requirements of 16 U.S.C. § 470 is, at this stage in the proceedings, superfluous.

tory judgment that defendants have violated and are continuing to violate certain federal statutes in constructing the highway and plaintiffs seek a preliminary and permanent injunction "enjoining and restraining the defendants from initiating, continuing with, or completing the construction of this highway project."

In Count I of the complaint, plaintiffs allege that defendants have violated provisions of the National Environmental Policy Act of 1969, 42 U.S.C. § 4332 (NEPA) by failing to conduct an Environmental Impact Study and otherwise perform their duties as "trustee[s] of the environment", 42 U.S.C. § 4331(b)(1). Plaintiffs also allege that defendants violated the Environmental Quality Improvement Act of 1970, 42 U.S.C. §§ 4371–74. In Count II, plaintiffs complain that defendants violated certain regulations promulgated pursuant to 23 U.S.C. § 315, because the location of PR–2177(4) does not promote the general welfare, conserve natural resources, advance economic and social values or promote desirable land utilization. 23 C.F.R. § 1(6)(c). In Count III, plaintiffs allege that defendants violated 23 U.S.C. § 128 by failing to conduct required public hearings or by conducting public hearings "at a time so distant in the past that presently affected citizens have not been afforded the opportunity to be heard or to express their grievances." In Count IV plaintiff alleges that defendants violated Ga. Code Ann. § 3A–120(h) by failing to conduct required hearings. In Counts V and VI plaintiffs set out claimed violations of the Fifth, Ninth and Fourteenth Amendments and 42 U.S.C. § 1983, citing the presumed constitutional right to a "clean and healthy environment," and the right to "domestic tranquility." A hearing was conducted in this action on April 20, 1976, and the action is presently before the court on plaintiffs' request for preliminary injunctive relief. Before turning to the merits of this issue, some review of the salient facts appearing of record and adduced at the evidentiary hearing is warranted.

Although the background facts are not clearly set out with respect to the initial planning and development of the entire Newnan Bypass project, it appears that the concept of a Newnan Bypass, as such, has been contemplated since the early 1960's.[2] The first concrete action on the northern section of the Bypass, which includes PR–2177(4), was initiated in 1967 and consisted of a survey report on the portion of the Bypass from Ga–34 west of Newnan to Ga–34 northeast of town. At that time, the total projected length of this section was over 12 miles, including a portion of Ga–34 to the Coweta-Fayette County line. The project was designated as part of the Federal Aid Secondary System under the number S–1424. The portion pertinent to this suit consists of a 2.62 mile section (as proposed) from Ga–34 west of Newnan to US–29, and the 2.187 miles section from US–29 to Ga–34 east which is the subject matter of this suit. Plaintiff has designated the US–29 to Ga–34 east section (PR–2177(4)) as Phase I of the project and the Ga–34 west to US–29 section as Phase II.[3] At the time of the 1967 survey, the entire S–1424 project was deemed justified by the following comments:

> The route . . . will serve as a bypass to the north of Newnan for traffic from State Routes 34 and 16 from the

---

**2.** The planned Bypass will eventually traverse the area from near I–85 northeast of Newnan around the northern, western and southern quadrants of the city to an intersection near I–85 southeast of Newnan. The parties have not discussed the planned development of the western and southwestern sections of the project.

**3.** Although the entire "Newnan Bypass" involves almost a complete circumferential highway around Newnan, see note 2, supra, the only section of the Bypass in issue is the section generally north of the city. In referring to this section, the terms "northern section", "Bypass" and "Newnan Bypass" will be used interchangeably as encompassing solely the road projects currently designated as PR–2177(4) and U–1424(3). The section designated as PR–2177(4) will, consistent with plaintiffs' designation, sometimes be referred to as "Phase I", and U–1424(3) will sometimes be referred to as "Phase II".

west and north providing easy access to I–85 and State Route 34 east and avoiding the poor alinement [sic] and congested traffic conditions in the central section of Newnan.

These comments are clearly applicable to the entire northern section of the Bypass (both Phase I and Phase II). The applicability of these comments to Phase I alone may be a critical factor in considering the merits of plaintiffs' arguments.

At the time of the initial survey, state officials apparently contemplated that the entire route designated as S–1424 would be federally funded; and initial approval was obtained on November 10, 1970 to place the route on the Federal-Aid Secondary System. In the interim, however, the Coweta County Commissioners purchased part of the right of way for Phase I (PR–2177(4)); and, as a result, state officials apparently erroneously concluded that Phase I would be ineligible for federal funding. Plaintiff has submitted a letter dated March 3, 1971, which recommends constructing Phase I with state funds, noting that Phase II could be constructed with federal funds, assuming all "federal" procedures were followed. Although the evidence is not clear on this point, the state had apparently planned to construct Phase II first, contingent upon federal funding; but upon completion of the section of I–85 near Newnan, officials decided to construct Phase I and Phase II concurrently. On September 19, 1973, Mr. Hal Rives, an engineer with the Georgia Department of Transportation (D.O.T.), drafted a memo concerning planning and scheduling of the Newnan Bypass project. In this memo, Mr. Rives notes that Phase I of the project should be constructed along the previously acquired right of way and that since state funds were to be used for construction, it would be possible to "bypass the public hearing and environmental requirements for the project." Mr. Rives also noted that "segment two [Phase II] should be developed as a federal aid secondary

project that will be funded with state funds." In discussing Phase II, Mr. Rives stated that a firm estimate for the cost of Phase II would be required since "[w]e will not let segment one to a construction contract until we know it is possible to continue the project around to State Route 34 on the west . . .."

In sum, up to this stage in the development of the project, Georgia D.O.T. officials apparently had concluded that the use of state funding for Phase I would preclude any need for environmental studies and hearings, and that Phase II of the project might also be constructed with state funds. Mr. Rives testified that the question of allocation of funding was the controlling issue in determining the planning and scheduling of the Newnan Bypass project. Mr. Rives also testified that the tentative 1973 decision to fund the entire northern section of the Bypass with state funds was necessitated by the Federal-Aid Highway Act of 1973.[4] This Act effectively reduced the amount of overall expenditures on federal-aid projects by reducing the proportion of state contributions while holding the dollar amount of the total federal expenditures constant. Thus, Mr. Rives testified that changing the federal-state contribution ratio from 50:50 to 70:30 released $9,000,-000.00 in "excess matching funds" for use in funding state road projects. Moreover, the 1973 Act established a dichotomy between "rural" projects and "urban" projects, which further limited the availability of federal funding for the Newnan Bypass project, since the project does not qualify for the apparently more numerous rural secondary funds. As a result, Mr. Drew Brown, Georgia D.O.T. program engineer, prepared a memorandum dated March 13, 1974, which contained the following comments:

> These two sections [Phase I and II] . . . are totally within the urban area boundary of Newnan and are not on the State Highway System. Therefore, federal-aid

4. The parties have not cited the specific portions of this Act affecting the instant case; however, the legal ramifications of the Act are not in dispute and were clearly explained by the witnesses.

rural secondary money cannot be spent on this construction because of the Federal-aid Highway Act of 1973. The consensus of the Department is that both sections of the Newnan Bypass be funded from the 100% state money made available by the 1973 Highway Act change in the state and federal matching ratio for federal-aid funded projects.

More recently, however, the state once again changed its position on the funding of Phase II, and Mr. Drew Brown has testified that the state is now proceeding to secure federal funding for Phase II as part of the federal-aid urban system. In accordance with the federal-aid numbering system, Phase II is now designated as U–1424(3). Preliminary engineering approval for U–1424(3) was obtained on January 20, 1976, with federal funding of $6,300.00. The state is now proceeding with Phase II as a federal-aid project, including all hearing requirements and environmental impact requirements attendant upon such projects. Phase I, on the other hand, will be constructed with 100% state funding and it is undisputed that none of the requisite federal hearing and environmental requirements have been completed with respect to this section of the Bypass. The defendants contend that Phase I is immune from these requirements because it is a state project without any federal participation whatsoever. Conversely, plaintiffs contend that Phase I is merely a segment of an overall project consisting of both Phase I and Phase II, thereby making the provisions of NEPA applicable to Phase I irrespective of the question of funding.

As noted above, this action, originally brought in six counts, includes state law statutory claims as well as federal statutory and constitutional claims; however, at least for the purposes of injunctive relief, plaintiffs have abandoned any violations predicated on state law requirements. Moreover, plaintiffs have not cited any cases recognizing a constitutional right to environmental tranquility, or extending the "right to be let alone" into the environmental context. All governmental action ultimately infringes on some individual's desire for peace and privacy; however, it is clear that one person's environmental tranquility may be another person's environmental nightmare of clogged streets during rush hour traffic. As a result, if any constitutional rights are involved in this action, they must flow from general precepts of substantive due process. On review of the evidence adduced to date, it is clear that plaintiffs have not shown that defendants herein have chosen a course of conduct which conflicts with and harms the overall public interest and welfare and hence is without any rational basis. The requirements expressed by Congress in the various statutory schemes potentially applicable to the construction of federal highways provide a more than adequate source of environmental rights. This court is not willing, on the basis of the record in this action, to rule that those rights are also encompassed within constitutional precepts.

The federal statutory claims in issue are expressed in counts I–III of the complaint. As noted above, the claim added by amendment is superfluous. *See* note 1, *supra*. In counts II and III, plaintiffs allege that construction of Phase I of the Newnan Bypass violates the public hearing requirements and environmental quality considerations incorporated in 23 U.S.C. §§ 109(h), 128, 315, and regulations promulgated pursuant thereto. These provisions apply generally to "Federal-aid highways" part of the federal-aid system, which includes the "Federal-aid secondary system." 23 U.S.C. § 103(c). Under these provisions, both a "corridor public hearing" and a "design public hearing" are required for a project that

(1) Is on a new location; or

(2) Would have a substantially different social, economic or environmental effect; or

(3) Would essentially change the layout or function of connecting roads or streets.

23 C.F.R. § 790.5(a). Neither a corridor nor a design hearing was held for Phase I, and such hearings have not yet been held for Phase II. Although the requirements of the federal-aid highway scheme are clear

and although there is no dispute that those requirements have not been fulfilled in the present case, the effect of noncompliance has not been clearly briefed by the parties. Similarly, the parties have not discussed the procedural applicability of this scheme to the instant action. Although the defendants argue that the applicability of this federal scheme turns not on the formal designation of the project as part of the federal-aid system, but on the question of federal funding, the law on this point is unclear. *See generally Named Individual Members of the San Antonio Conservation Society v. Texas Highway Department*, 496 F.2d 1017 (5th Cir. 1974) (hereinafter *San Antonio II*). On the other hand, the state has conceded that all procedural requirements set forth in Title 23 will be completed if the court rules that the Environmental Impact Statement requirements of NEPA are applicable to construction of Phase I.[5] As a result, further consideration of the applicability of the provisions of Title 23 to the dispute sub judice is not warranted.

The merits of plaintiffs' entitlement to preliminary injunctive relief turn on the question of the applicability of the following portions of the NEPA:

> [T]o the fullest extent possible . . . (2) all agencies of the Federal Government shall . . . (C) include in every recommendation or report on proposals for legislation and other *major Federal actions significantly affecting the quality of the human environment*, a detailed statement by the responsible official on—(i) the environmental impact of the proposed action . . . ..

42 U.S.C. § 4332 (emphasis added). This provision is expressly applicable to federal agencies, including the Federal Highway Administration (FHWA); and, pursuant to judicial interpretation, the provision is equally applicable to the construction of state highways when such construction involves "major federal action" which has a "significant affect" on the environment. Plaintiffs have argued that construction of Phase I will significantly affect the environment; and plaintiffs have introduced evidence showing that the highway will pass within a few hundred feet of their property, through woodlands presently containing small wildlife and used by plaintiffs for recreational purposes. Plaintiffs have also introduced evidence showing that the highway will pass through or near the historically significant site of Bullsboro, the first settlement of Coweta County. Plaintiffs' witness testified that construction of the highway on this site will effectively destroy the archaeological value and accordingly the historical and cultural significance of this unexcavated site. These factors are clearly relevant in assessing the environmental impact of Phase I. *See, e. g.*, 23 C.F.R. § 771.18(n). It is clear then, that the project in issue will significantly affect the environment, and defendants do not contend otherwise. Instead, defendants argue that the construction of Phase I does not involve "major federal action"; that plaintiffs have not alleged individualized injury in fact in the Article III case or controversy sense; and that plaintiffs are not otherwise entitled to injunctive relief.

Turning first to the standing question, it should be noted that plaintiffs filed an amendment to the complaint adding certain individuals as named party plaintiffs, *see* note 1, *supra*, thereby effectively mooting the standing issue. In fact, on review of the testimony and the allegations of the complaint, it appears that the amendment may be superfluous; for on review of the relevant case law, it is clear that plaintiffs have the requisite standing to pursue this litigation. *Compare Sierra Club v. Morton*,

---

5. The court made some inquiry at the hearing into the question of whether federal funding may now be secured for Phase I upon retroactive compliance with the various federal hearing and environmental requirements governing construction of federal-aid highways. Although the witnesses were unclear on this point, it appears that Phase I is not yet finally ineligible for federal funding. In fact, Mr. Drew Brown indicated that should this court rule that federal environmental requirements were applicable to Phase I, the state might, in complying with these requirements, actively seek federal funding for Phase I as well as Phase II.

405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), *with United States v. S.C.R.A.P.*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). In the *SCRAP* case, the Court ruled that the plaintiff's burden of pleading individual economic, recreational, and aesthetic harm would be satisfied by allegations "that he has been or will in fact be *perceptibly harmed* by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action." *Id.* at 689–90, 93 at 2416. (emphasis added). In reaching this conclusion, the Court specifically rejected the argument that plaintiffs alleging environmental injury must show that they are "significantly" affected by agency action, noting that the "injury in fact" test in the standing context reflects the requirement that "a person be 'adversely affected' or 'aggrieved,' and it serves to distinguish a *person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem.*" *Id.* at 689, 93 S.Ct. at 2417 n. 14. Thus, in the environmental context, it appears that the standing question turns, at the pleading stage, on whether the plaintiffs (or plaintiff associations) have alleged an individualized adverse impact, or direct injury to their environmental interests; and in the highway construction context, it appears that this test depends largely on the plaintiff's proximity to the proposed construction. *Compare Named Individual Members of the San Antonio Conservation Society v. Texas Highway Department*, 446 F.2d 1013 (5th Cir. 1971) (hereinafter *San Antonio I*), *with Citizens for Food & Progress, Inc. v. Musgrove*, 397 F.Supp. 397 (N.D.Ga.1975) (Henderson, J.). In the instant case, as noted above, plaintiffs have introduced evidence showing that Phase I will be constructed through woodlands adjacent to their homes, that the highway will destroy the value of the woodlands as a recreational area and possibly create a danger to their children, that the highway will potentially affect the cultural heritage of Coweta County by destroying the archaeological significance of the Bullsboro site, and that the highway will reduce the resale value of their homes. Irrespective of the question of economic injury, it is clear that plaintiffs have shown sufficient individual environmental injury to have standing to pursue their claims for relief.

■ The question of individual injury is also related to the question of plaintiffs' entitlement to injunctive relief, and the parties differ concerning the issue of whether the court should rule on this question within the parameters of the following traditional prerequisites to equitable relief:

(1) [A] substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is now granted, (3) . . . the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) . . . granting the preliminary injunction will not disserve the public interest . . . .

*Morgan v. Fletcher*, 518 F.2d 236, 239 (5th Cir. 1975). Despite plaintiffs' arguments to the contrary, it is clear that consideration of each of these factors is required in the environmental law context. *E. g., Canal Authority v. Callaway*, 489 F.2d 567 (5th Cir. 1974); *Citizens for Food & Progress, Inc. v. Musgrove, supra* (Order of Dec. 30, 1974). Moreover, it is clear that "[t]he burden of persuasion on all of the four requirements for a preliminary injunction is at all times upon the plaintiff." *Canal Authority v. Callaway, supra* at 573. Although plaintiffs herein are clearly incorrect in arguing that the primary inquiry in the environmental context should focus on the question of whether or not defendants have violated the requirements of the NEPA, rather than upon the question of irreparable harm, the court does not agree with defendants' implicit argument that environmental interests are never significant or "irreparable" enough to warrant injunctive relief. On the contrary, the protection of such interests is clearly the subject of a complex federal statutory and regulatory scheme, and within the parameters of that scheme, the question of irreparable harm does not require a value judgment with respect to

the importance of the environmental interests recognized by Congress. On the contrary, the question involves a determination of whether environmental interests will be harmed and whether that harm will be irreparable.

In the *Canal Authority* case, it appeared that any environmental harm which might occur was potentially reversible; therefore consideration of the "irreparable harm" question presented a critical issue:

> Many of the dangers, *e. g.*, loss of recreational use of the lake, loss of tourism, and alteration of the lake ecology, can hardly be termed irreparable if, as alleged, they are fully reversible by the simple expedient of refilling the lake if the trial on the merits goes for plaintiffs.

*Id.* at 577. In contrast, in the instant case, the environmental and aesthetic harm attendant upon construction of a highway in close proximity to plaintiffs' property is not readily reversible, and plaintiffs have introduced evidence that the archaeological harm to the Bullsboro site will be irreparable if the construction of the highway is allowed to continue. Defendants have not introduced any evidence to the contrary, nor have defendants attempted to show that delay in construction of the highway will cause them any harm whatsoever.[6] Similarly, in environmental cases such as this, the "public interest" question is tantamount to the "independent utility" issue critical to determination of the merits of the case. In that regard, consideration of the merits or the "likelihood of prevailing" question, clearly not the only relevant inquiry is nevertheless often the determinative factor in injunctive cases:

> [R]egardless of the balance of relative hardships threatened to the parties, the granting of a preliminary injunction would be inequitable if the plaintiff has no chance of success on the merits. The importance of this requirement varies with the relative balance of threatened hardships facing each of the parties.

*Id.* at 576. As a result, given that plaintiffs have shown irreversible and irreparable harm to their environmental interests and given that plaintiffs have shown that the other relevant interests are balanced or possibly favoring issuance of injunctive relief, the question of whether an injunction should issue must turn on whether plaintiffs have shown some likelihood of prevailing on the merits.

As noted above, in considering the merits, the disputed question in this case is not whether the construction of Phase I will significantly harm the environment, but whether the project involves "major federal action", as that term is applied under the NEPA. It appears, in comparing defendants' post-hearing briefs with their pre-hearing briefs, that they have significantly changed their legal position on this question. Prior to the hearing, defendants conceded that the question of federal funding was not the sine qua non of the issue sub judice. *See, e. g., Citizens for Balanced Environment and Transportation, Inc. v. Volpe*, 376 F.Supp. 806 (D.Conn.1974), *aff'd*, 503 F.2d 601 (2d Cir. 1974) (per curiam) (state's intention to build a highway with state funds does not determine federal consequences of noncompliance with NEPA). Similarly, at that time, defendants agreed with plaintiffs that when a "major federal action" is segmented into federal and non-federal sections, perhaps for the purpose of avoiding the requirements of the NEPA, then the entire project is subject to the NEPA, irrespective of the funding question. *See id.* In that regard, all the parties apparently agree that a "major federal action" is a federal action of "superior, large and considerable importance involving substantial planning, time, resources or expenditures." 23 C.F.R. § 771.9(d). Following the hearing, defendants have apparently changed their position on these legal issues, and now argue that their decision to fund Phase I without federal assistance is indeed the determinative factor in the instant case. Alternatively, defendants ar-

---

**6.** The fact that the state may yet be able to obtain federal funding for Phase I, *see* note 5, *supra* militates against a finding that the state interest and the interest of the public will be harmed by issuance of injunctive relief.

gue that plaintiffs' segmentation theory is not applicable when the putative "federal" segment of the road is merely in the planning stages, since planning and engineering studies, even if federally funded, do not make a highway project a "major federal action" for purposes of the NEPA. This court disagrees with both contentions.

■ The basic contention asserted in the defendant state officials' post-hearing brief is that "states have a sovereign right to determine which highway projects shall be federally financed." While this court does not disagree with this proposition, it does not follow that the state may disregard otherwise applicable federal environmental requirements solely on the basis of the funding question. Similarly, this court agrees with defendants that the use of limited federal funding during the planning and design stage of a highway project does not constitute "major federal action" under the NEPA. *E. g., Atlanta Coalition on the Transportation Crisis, Inc. v. Atlanta Regional Commission*, Civil Action No. 74–514 (N.D.Ga. July 9, 1975); *Citizens for Balanced Environment and Transportation, Inc. v. Volpe, supra; James River & Kanawha Canal Parks v. Richmond Metropolitan Authority*, 359 F.Supp. 611 (E.D.Va.1973). Nevertheless, the issue sub judice is not whether Phase I is, in and of itself, a "major federal action"; and similarly, the question is not whether Phase II is, at this stage in its development, a "major federal action." The issue here is one of segmentation; and it is clear, on review of the cases cited by defendants, that the absence of federal funding would not have excused noncompliance with NEPA requirements had the highway projects in issue been found to be segments of an overall federal construction project. Thus, in the primary case relied upon by defendants in their post-hearing briefs, the court stated the following:

The law is clear that as a partner to authorized federal participation in a highway project, a State cannot subvert national environmental policy by shifting federal funds from an authorized project to avoid the ramifications of NEPA's commands. *San Antonio Conservation Society v. Texas Highway Department, supra*, at 1027. . . . [T]he rule laid down in *San Antonio* does not apply to the instant case because the Secretary of Transportation never authorized federal participation in construction of *any segment of the East By-Pass.* . . . [T]he project was not de-programmed for fear the proposed alignment of the First Segment could not withstand EIS scrutiny.

*Scottsdale Mall v. Indiana*, No. IP 74–688–C (S.D.Ind. Apr. 2, 1976) (emphasis added). Although these comments might tend to support defendants' theory, on review of the balance of the opinion, it is clear that the *Scottsdale Mall* court *rejected* plaintiff's segmentation theory and did not rule that the theory was not applicable because of the absence of federal funding. In fact, this language implicitly indicates that had federal funding and participation been anticipated for either segment of the eastern portion of the bypass highway in issue, the court might have ruled the other way.[7] In any event, the court found that the entire eastern section of the bypass fulfilled the "independent utility" and "logical termini" tests applicable in segmentation cases:

[T]he FHWA has indicated the appropriate length of highway for EIS purposes encompasses the entire East By-Pass from a point on U.S. 31 south of South Bend to a point on U.S. 20 east of Elkhart. . . . The Court believes this length of highway fully meets the standard set forth in federal regulations:

"(a) A highway section should be as long as practicable to permit considera-

---

**7.** Notwithstanding the fact that the eastern section of the bypass highway around South Bend serves a larger metropolitan area, it would seem that the project in issue in the *Scottsdale Mall* case, involving the entire eastern section of the bypass, distinguishes that case from the instant proceeding. If indeed the eastern section of the highway around South Bend had in turn been segmented into federal and non-federal segments, the case would be more nearly apposite to the action sub judice.

tion of environmental matters on a broad scope and meaningful evaluation of alternatives. . . . Piecemealing proposed highway improvements in Separate EIS's is to be avoided. The highway section identified in the EIS . . . should include the total length of highway between logical termini even though only a short length of the total identified highway section is proposed for construction . . . ." 23 C.F.R. § 771.5(a).

The Court takes judicial notice of the existence of U.S. 31 and U.S. 20 as major national highways which qualify as logical termini for a By-Pass around a major metropolitan area. In addition, the East By-Pass meets the test raised by plaintiff that a highway section for an EIS be "as large as is feasible under present construction and financing practices and at least be *independently* supportable by meaningful terminal points." *Indian Lookout Alliance v. Volpe*, 484 F.2d 11, 19 (8th Cir. 1973) (emphasis added). The . . . evidence introduced at trial . . . support[s] the conclusion that the projected daily volume of traffic on the East By-Pass, 15,000 vehicles today and 30,000 in the year 1991, justifies a characterization of the project as one which has independent significance.

*Id.* (slip op. at pp. 10–11). *See also Citizens for Balanced Environment, supra* at 813–14.

Defendants arguments, predicated on the fact that Phase II of the Newnan Bypass (U–1424(3)) has not yet received final federal approval and construction funding would effectively emasculate federal environmental requirements whenever, because of the availability of funding, a state decides to accelerate construction of a portion of a highway project. In such circumstances, the question of whether or not the segmented road has secured final federal approval is simply not relevant to the question of whether the state-funded portion of the project is immune from federal environmental requirements. If indeed, the state segment is without independent utility except as an extension of the proposed federal road, the fact that the state is actively seeking to secure federal funding for one segment is all that is required as a predicate for injunctive relief to maintain the status quo (assuming the other requisites of equitable relief are fulfilled). Defendants' arguments to the contrary are without merit. If indeed, defendants subsequently determine to proceed with construction of both Phase I and Phase II with 100% state funding, the appropriate remedy is to petition for dissolution of the injunction. After a highway is constructed, it is simply too late to determine the question of segmentation and then attempt to remedy the irreversible harm to the environment which has already occurred.

A cursory review of the large number of segmentation cases cited by the parties reveals that each case must be decided on its own merits. The proper inquiry involves a balancing of several factors, including the question of whether the segmented portion is a mere extension of a federal road, or connective link; whether, even if it is an extension or connection between two federal roads, it nevertheless has independent utility; whether the segment has logical termini; and whether the segment serves primarily local needs. The leading case in this jurisdiction on the issue is the *San Antonio* case, which was first presented to the United States Court of Appeals for the Fifth Circuit on the question of segmentation of the San Antonio north expressway project into *three* segments, with the middle and most controversial segment being state funded and, as argued by defendants, immune from federal EIS requirements. The court ruled that such segmentation did not excuse compliance with the NEPA. *San Antonio I, supra.* Thereafter, on a subsequent appeal following remand, the Court ruled that Congress, in enacting section 154 of the Federal-Aid Highway Act of 1973, had severed all federal connection with the San Antonio project. As a result, the court ruled that the EIS requirements of NEPA were not applicable, despite plaintiff's arguments that the *entire* six mile

section (combining the three former segments) of the highway was merely a segment of overall interstate highway system serving the area. The court concluded that the fact the road connected two federal highways was not determinative, noting that "virtually every road in the country crosses or interchanges with federal-aid highways, and that there are many state-constructed roads which do not form a part of the federal network." *San Antonio II, supra* at 1024. The court ruled that the expressway has an "independent utility . . . found in its connection of downtown San Antonio with the airport and in its primary purpose to relieve the serious traffic problem in central San Antonio." *Id.*

Defendants, in their post-hearing briefs, do not emphasize the independent utility issue, perhaps in recognition that Phase I of Newnan Bypass has little or no value in terms of traffic flow into and out of the Newnan area. In fact, the first witness called by plaintiff, Mr. F. Breen, director of planning and programming for the Georgia D.O.T., clearly stated that the eastern section of the Bypass (PR–2177(4) has never been looked at as a source of independent utility, stating that D.O.T. planning engineers consider projects such as PR–2177(4) only insofar as they relate to the entire system as a whole. Although defendants attempted to show that Phase I has some independent utility for persons in the immediate area, the residents of this area themselves testified that at least insofar as Phase I might provide a route from US–29 to I–85 for people traveling to Atlanta, it would be shorter to travel north on US–29 for a few miles to another intersection closer to Atlanta. On review of the evidence, it appears that the only independent purpose to be served by Phase I would be as a "short cut" by people living outside Newnan on US–29 who desire to reach a few commercial establishments along Ga–34

east near town. The state has not made any traffic studies on this section of the highway, but all studies relate to the entire northern segment of the Bypass. The court does not doubt that both PR–2177(4) and U–1424(3), when considered together, would possess independent utility predicated on relief of congested traffic conditions in downtown Newnan;[8] however, there is no evidence whatsoever that PR–2177(4) alone would serve a similar purpose. It is clear that the sole criteria utilized in programming the Newnan Bypass was funding. The question of independent utility and of course the question of either a favorable or adverse environmental impact was simply not a factor in deciding to construct PR–2177(4). Perhaps, as testified by the city manager of Newnan, the fact that the city has acquired a 400 acre tract of land adjacent to the route and zoned that land for commercial use presented an encouraging factor; however, *prospective* commercial development and the attendant increase in land values, albeit an apparent benefit for the city, does not warrant a finding that PR–2177(4) serves an independent, useful purpose, absent construction of Phase II.

■ In sum, absent any persuasive evidence of independent utility, and given the affirmative evidence that PR–2177(4) has no utility insofar as the Newnan-Atlanta traffic flow is concerned, it is clear that defendants have violated the mandates of federal environmental law and policy by failing to conduct proper studies concerning the construction of this segment of the Newnan Bypass. It is likewise clear that state officials are actively seeking federal funding for the construction of Phase II; therefore irrespective of the question of whether Phase II is itself a "major federal action" at *this* time, the prospects of its becoming a "major federal action" are sufficiently great to warrant treating it as sufficiently federal for purpose of applying unified environmental standards to the en-

---

**8.** The entire northern section of the Bypass, like the highway considered in *Scottsdale Mall, see* note 7, *supra,* and like the highway considered in *San Antonio II,* would appear to have "logical termini" and "independent utility", as those terms are applied in segmentation cases.

tire project. Thus, plaintiffs have shown a substantial likelihood that they will prevail on the merits; and this showing, coupled with their showing of irreparable harm to their environmental interests and the absence of harm to defendants or the public interest indicates that issuance of injunctive relief is warranted.

Accordingly, for the reasons hereinabove expressed, plaintiffs' motion for preliminary injunctive relief is GRANTED. Defendants are hereby ENJOINED from awarding contracts and proceeding with any portion of the construction of PR–2177(4) absent preparation of an EIS and full compliance with all applicable federal and state requirements concerning the environmental, historical and cultural impact of the road project.

IT IS SO ORDERED.

Appendix "A" to follow.

## APPENDIX "A"