Mrs. William T. BENNETT et al.

v.

W. T. TAYLOR et al.

Civ. A. No. 78–417–A.

United States District Court,
M. D. Louisiana.

Dec. 31, 1980.

J. Arthur Smith, III, Smith & Osborne, Baton Rouge, for plaintiffs.

Sharon F. Lyles, Executive Asst. Gen. Counsel, State of Louisiana, Dept. of Transportation and Development, Baton Rouge, La., for State Defendants.

C. Michael Hill, Asst. U. S. Atty., Baton Rouge, La., Lawrence R. Liebesman, Atty., Dept. of Justice, Washington, D. C., Jean Rogers, Regional Counsel, Federal Highway Administration, Fort Worth, Tex., for Federal Defendants.

## MEMORANDUM OPINION

JOHN V. PARKER, Chief Judge.

Plaintiffs, Mrs. William T. Bennett and the East Feliciana Historical Preservation Society, Inc., challenge the construction of a state highway within the town limits of Clinton, Louisiana. Made defendants are W. T. Taylor, Assistant Secretary, Office of Highways, Louisiana Department of Transportation and Development; George A.

Fischer, Secretary, Louisiana Department of Transportation and Development; Brock Adams, Secretary, United States Department of Transportation; J. W. White, Regional Administrator, Federal Highway Administration, United States Department of Transportation; and Morris C. Reinhardt, Division Administrator, Federal Highway Administration, United States Department of Transportation.

This litigation is the outgrowth of two disconsonant congressional aims: that of providing first-class highway access to every American home and business, on the one hand, while preserving and protecting every element of the human environment, on the other.

In furtherance of the first aim, the Congress has adopted the Federal-Aid Highways Act, 23 U.S.C. § 101, *et seq.*, and the Department of Transportation Act, 49 U.S.C. § 1651, *et seq.*, which, together with assorted administrative regulations, mandate federal financial aid to the states for the construction of everything from super highways on the interstate system to country lanes on the secondary system. As impediments to the first objective, the Congress has adopted the National Environmental Policy Act of 1969, 42 U.S.C. § 4321, *et seq.*, and the National Historic Preservation Act, 16 U.S.C. § 470, *et seq.*, which, together with their assorted administrative regulations require preparation of an environmental impact statement before every major federal action "significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), and encourage preservation of historic areas and buildings by requiring public hearings prior to commencing federal "undertakings" affecting such areas or buildings. Included in the highway aid legislation are identical provisions, 23 U.S.C. § 138 and 49 U.S.C. § 1653(f), which specifically forbid federal approval of any program or project that requires use of any land from an historic site without meeting prescribed criteria.

Plaintiffs seek declaratory and injunctive relief against construction of a state highway. The matter was tried to the Court without a jury and submitted on briefs. Subsequent to submission, plaintiffs moved for a preliminary injunction because of activities undertaken by the state authorities relating to right-of-way clearing and utility relocation in the Clinton area. After hearing, a preliminary injunction was granted on May 8, 1980, restraining and enjoining the state defendants from trimming or cutting trees and other foliage in certain specified areas. This action was taken in order to preserve the status quo pending decision upon the merits.

The Court now decides the merits of this case.

The issue is rather simply stated. The highway in question, Louisiana 67, runs from Baton Rouge north through Clinton to the Mississippi state line. It was for years a part of the federal aid "secondary system" under the Federal-Aid Highways Act, 23 U.S.C. § 103. Virtually all of the highway has been improved over the years except the 4.5 mile stretch through Clinton, and each improvement was accomplished in part with federal money. The State of Louisiana now proposes to complete this last portion of the highway using state funds exclusively. The issue to be resolved is whether there is any federal involvement in this construction project amounting to "major Federal actions significantly affecting the human environment." 42 U.S.C. § 4332(2)(C). The defendants all concede that if there is "Federal action," then the road may not be constructed until after an environmental impact statement has been prepared and the other requirements of the Environmental Act have been met. A finding of federal action is essential to plaintiffs' case because Congress did not intend the environmental laws to apply to state, local or private actions. *Atlanta Coalition on Transportation Crisis, Inc. v. Atlanta Regional Commission*, 599 F.2d 1333, 1344 (5th Cir. 1979).

A brief discussion of the federal highway aid system is necessary. The Federal-Aid Law, 23 U.S.C. § 103, establishes three

types of highways,[1] the primary system, the secondary system and the interstate system. Federal financing and construction requirements are different for each of these systems. The primary system relates to main highways, while the secondary system relates to farm-to-market and other state and local roads. In order to qualify for federal aid, roads on all systems must meet established federal criteria. All such assistance comes from the Federal Highway Trust and funds for secondary roads are annually apportioned among the several states by the Congress according to its own formula. 23 U.S.C. § 104. The secondary system leaves most details up to the states which select projects to be constructed, construct them and then claim reimbursement. During the time period with which we are concerned, secondary roads were subject to a two-step procedure. First, the states nominated projects and assigned project numbers. This process was referred to as "Stage 1" and simply indicated that the state had a particular project under consideration. In effect, the project thus nominated became eligible for future inclusion within the secondary reimbursement program. If the state authorities decided to actually construct the project, it would then be raised to the "Stage 2" level which committed a certain amount of secondary road funds from the allocation to that state for the year in question. The federal authorities would issue written evidence of the commitment and a contract was executed requiring that the state meet federal construction standards. No advance federal approval of projects was required. After completion of the project, the state submitted evidence of compliance and the federal monies were paid.

Louisiana 67, known as Plank Road, has since 1941 been part of Louisiana's Federal-Aid Secondary System. The evidence establishes that in the late 1950's, Louisiana decided to improve the entire length of Plank Road from Baton Rouge to the state line. Improvements consisted mostly of resurfacing the existing roadway and widening the lanes of the two-lane highway. In the Town of Clinton, for a stretch of 1.2 miles from Louisiana 10 to Louisiana 63, the plans called for the addition of two extra lanes, making the highway a four-lane road in that area.

The highway was broken up into separate projects and both state and federal (secondary aid) project numbers. In the 1960's, all of the projects south of Clinton except the project at issue here were completed. North of Clinton to the Mississippi line, the work was divided into two projects. These projects, under new numbers, have recently been completed with federal aid and after full compliance with the environmental laws, including an impact study.

The Louisiana Department of Transportation and Development is now attempting to proceed with construction of this last remaining "unimproved" segment. The project starts in Clinton at the intersection of Louisiana 10 and Louisiana 67 and runs about 4.5 miles southward. Along this part of Louisiana 67, many beautiful antebellum homes are located. Among the many historical sites in this area is the Brame-Bennett House, owned by the plaintiff Mrs. Bennett.[2] This structure was built in 1840 and is listed on the National Register of Historical Places. Other homes which abut the highway in this section of Clinton are also on the National Register or are eligible for inclusion. The Brame-Bennett House is presently located about sixty feet from the edge of the existing road, and the owner fears damage will be done to the house by widening the road. There is also concern for the total environment of the area.

The project at issue, officially designated as Clinton-Olive Branch, S–187(12) (con-

---

1. Congress amended Section 103 in 1973 so as to add an urban system and to revise reimbursement procedures. Since all events with which we are concerned occurred prior to 1973, we do not consider the effect of that amendment, if any.

2. The defendants have not contested the standing of either plaintiff to bring this action, and it seems clear that each does have standing. *Hawthorn Environmental Preservation Association v. Coleman*, 417 F.Supp. 1091 (N.D.Ga. 1976), *aff'd*, 551 F.2d 1055 (5th Cir. 1977).

struction) and S–187(13) (right-of-way), was planned to be constructed under the secondary aid program. In 1964, the project already had "Stage 1" status and in accordance with 23 U.S.C. § 128 as it then read, a public hearing was held in Clinton to discuss the economic impact of the anticipated construction. On February 7, 1967, the Bureau of Public Roads (federal) authorized acquisition of right-of-way and adjustment of utilities. This action bestowed Stage 2 status to the right-of-way portion of the project (S–187[13]) under the federal Policy and Procedure Memorandum 21–1, April 15, 1958, and committed $100,000 in federal funds toward the project. A formal "Federal-Aid Project Agreement" was executed, dated April 5, 1967.

The federal obligation was terminated on May 5, 1967, when the project agreement was cancelled by the state. This action was undertaken in response to a letter from the state highway department informing the Bureau of Public Roads of the postponement of the construction of the project. The federal officials withdrew their letter of authorization (February 7, 1967) and project S–187(13) reverted to Stage 1. The federal funds were used on some other Louisiana secondary road project.

On August 20, 1970, Louisiana eliminated the entire project from the Federal-Aid Secondary System. In 1976 the Louisiana Legislature revived the project by including it in the state's five-year highway program. Financing will come from a Louisiana bond issue and no federal funds will be used in constructing this portion of the road.

### National Environmental Policy Act

The National Environmental Policy Act of 1969, 42 U.S.C. § 4321, et seq., effective January 1, 1970, reflects the congressional concern for the preservation of the environment mentioned earlier. This Act was designed as an attempt to "guarantee that the most intelligent, optimally beneficial environmental decision will ultimately be made." *Florida Wildlife Federation v. Goldschmidt*, 611 F.2d 547, 549 (5th Cir. 1980).

In implementation of that Act, the Federal Highway Administration has adopted a Policy and Procedure Memorandum.

■ The Environmental Act by its own terms applies only to federal agencies and officials and to "major Federal actions," 42 U.S.C. § 4332. It is not directed to state action and the requirements of the Act are not applicable unless there is federal involvement. *Atlanta Coalition on Transportation Crisis, Inc. v. Atlanta Regional Commission*, 599 F.2d 1333 (5th Cir. 1979).

### A. Segmentation

The first basis relied upon by plaintiffs for their argument that the Environmental Act is applicable to this construction is a theory of "segmentation." Plaintiffs assert that Louisiana 67 is, and has been since its initial formulation, one highway project and that it is improper to separate this last remaining part from the rest—all of which was rebuilt using federal secondary aid funds.

■ Plaintiffs have cited cases in which the courts have found segmentation of a project, usually environmentally controversial, from a larger federally involved construction plan. In some instances, compliance with the Environmental Act has been required even though the segregated project was to be wholly state funded. The issue to be determined is whether there has been federal action on this project after the effective date of that law, January 1, 1970. Highway projects completed prior to that date are immune from its provisions. *Scottsdale Mall v. State of Indiana*, 418 F.Supp. 296 (S.D.Ind.1976), *vacated and remanded*, 549 F.2d 484 (7th Cir. 1977), *writ den.*, 434 U.S. 1008, 98 S.Ct. 717, 54 L.Ed.2d 750 (1978). Technically, the Act cannot be applied retroactively, although compliance may be necessary for ongoing construction. *Life of the Land v. Brinegar*, 485 F.2d 460, 466, n.7 (9th Cir. 1973), *cert. den.*, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); *Lathan v. Brinegar*, 506 F.2d 677 (9th Cir. 1974), among many others. Ongoing projects are projects initiated before the

effective date of the Act but continuing and not substantially complete upon its enactment. Different and often conflicting tests have been used in determining whether the Act is pertinent to an ongoing project. A common thread found in all these cases, however, is major federal action after January 1, 1970. *Olivares v. Martin*, 555 F.2d 1192 (5th Cir. 1977); *Sworob v. Harris*, 451 F.Supp. 96 (E.D.Pa.1978), *aff'd*, 578 F.2d 1376 (3rd Cir. 1978), *cert. den.*, 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979).

The documentary evidence submitted by plaintiffs shows that all projects south of the Clinton-Olive Branch project were completed before 1970 under the secondary aid program. Project S–187(6), the part immediately south of this one, was begun in 1964 and the final voucher was approved in 1969. A Federal-Aid Project Agreement for S–187(2) was entered in 1959 but no evidence of its completion has been put into the record. The final voucher for S–187(3) was submitted in 1969, for S–187(5) in 1966, for S–187(7) in 1965 and for US–187(8) in 1968. The starting date and completion of the project numbered S–187(10) has not been offered into evidence. The remaining projects were right-of-way acquisitions, S–187(4) US–187(9) and S–187(11), and the documents show that they were closed in 1975 and 1976. However, program approval for S–187(4) was given in 1962, for S–187(11) in 1963 and for US–187(9) in 1965 and the testimony of Kenneth A. Perrett, District Engineer, Federal Highway Administration, indicated that these dates simply show the day of final accounting and not the time when the land was actually purchased (see deposition, page 47). Perrett testified that the right-of-way was probably purchased several years prior to the accounting settlement. Obviously, the construction of these projects could not have started until the right-of-way was acquired. Project S–187(4) was the right-of-way project for construction project S–187(3), and S–187(11) was the corresponding project with S–187(6). US–187(9) was located within the city limits of Baton Rouge but the Court cannot determine its associated construction project.

Since these projects were completed prior to January 1, 1970, they were not affected by the Environmental Act. *Scottsdale Mall, supra.* Plaintiffs urge that because of its close connexity with the other projects on Louisiana 67, this final part must meet federal environmental standards despite the fact that the other projects had no such requirement.

In support of their position, plaintiffs cite *Named Individual Members of San Antonio Conservation Society v. Texas Highway Department*, 446 F.2d 1013 (5th Cir. 1971), *cert. den.*, 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972). There, federal approval of the two "end segments" of an expressway project came on August 13, 1970, after the effective date of the Act. The construction of the end projects was to be started and completed subsequent to January 1, 1970. Major federal action was to have taken place after 1970, thus invoking compliance with the Act. The middle section had no independent utility in and of itself without the two outer federal projects. All three projects were, in reality, one project. The Court held that no retroactivity was involved in the application of the Environmental Act because the law was in effect at the time the Secretary authorized federal funding of the two "end segments" of the expressway.

In *Hawthorn Environmental Preservation Association v. Coleman*, 417 F.Supp. 1091 (N.D.Ga.1976), *aff'd*, 551 F.2d 1055 (5th Cir. 1977), the Court was concerned with the Newnan Georgia Bypass. Construction was broken up into two phases, Phase I and Phase II. Both phases were originally to be federally funded and on November 10, 1970, the route (S–1424) was placed on the Federal-Aid Secondary System. Later, Georgia officials decided to proceed with state funds on Phase I and to use federal money on Phase II. On January 20, 1976, preliminary engineering approval from the appropriate federal officials was obtained and federal funds were obligated for Phase II.

The Court granted the plaintiff a preliminary injunction enjoining the defendants from constructing Phase I of the Newnan Bypass until an environmental impact statement had been prepared and there had been full compliance with all federal environmental laws. The Court found that Phase I did not have independent utility and that the two phases were closely interrelated. Although the Court refused to hold that Phase II at that time was "major federal action," the fact that the state highway officials were attempting to secure federal help in funding Phase II and the great likelihood of this second segment becoming "major federal action" mandated that Phase I also proceed in compliance with the Act.

The significance of this case to this litigation is that major federal involvement took place or was to take place on a portion of the same project *after* the Act became effective. This is a basic and necessary element which must exist before improper segmentation can be found and the segregated state project can be forced to comply with federal environmental requirements. Here, there has been no federal action involving any portion of Louisiana 67 south of Louisiana 10 after the Act became effective on January 1, 1970. Plaintiffs argue that we must consider Louisiana 67 as one project in its entire length and that federal action has been taken regarding that portion of the road from Louisiana 10 north to the Mississippi state line after January 1, 1970.

In *Thompson v. Fugate*, 347 F.Supp. 120 (E.D.Va.1972), the plaintiffs attempted to stop construction of a circumferential urban highway through their property. The plaintiffs there, as plaintiffs here, were concerned about the adverse effect the highway would have on a plantation home. The highway segment involved was an 8.3 mile stretch of road which was part of a 75-mile beltway around Richmond, Virginia. Two-thirds of this beltway was designed as part of the Interstate System (I–295) and the remaining part as Virginia Route 288. The section at issue was part of Route 288.

Federal location approval for the projects on Route 288 came in 1970 and 1971. The disputed 8.3 mile project was given location approval in January, 1971.

The Court held that the beltway must be considered as a whole and it refused to allow this one small project to be isolated from the rest of Route 288. Like the Newnan Bypass in *Hawthorn*, substantial federal involvement was found to have existed on a connected interwoven project after the effective date of the Act. The state highway officials were complying with the Act for 21 miles of a 29.2 mile unified highway so that federal funds would be available for the 21 miles and, therefore, the Court held that the remaining segment must also conform.

The case factually closest to the suit at hand is *Scottsdale Mall v. State of Indiana, supra.* In *Scottsdale Mall*, a 28-mile long bypass around South Bend-Elkhand, Indiana, was being planned and constructed. A western section of the bypass (West Bypass) had been completed prior to the effective date of the Act and steps to start construction on the remaining segments (East Bypass) were being initiated when litigation started. When it became obvious that there would be environmental problems with the project just east of the completed West Bypass, the state officials decided to remove it from federal financing. Later, all of the projects consisting of the East Bypass were removed. These actions took place in 1974 and 1975.

The district court held that construction of the East Bypass could proceed without an environmental impact statement. The district court rejected plaintiff's argument that the East Bypass had to comply with the Act because the West Bypass had been built (prior to the effective date of the Act) with federal money.

The Court of Appeals overturned the district court on the basis of federal assistance in the East Bypass itself. The Court found that federal money for preliminary engineering studies had been spent on the East Bypass between August, 1971, and February, 1975, and that there was federal

participation in programming, location, design, preliminary engineering and right-of-way acquisition. The Court found that these activities constituted major federal action.[3] The appellate court did not reach the segmentation issue.

The exhibits filed at trial reveal that repairs on Louisiana 67 continue to be made. In the City of Baton Rouge, certain sections of Louisiana 67 have been widened to four lanes after January 1, 1970. This work was done with state funds. Also, in Baton Rouge, work was done to upgrade a railroad crossing and overlay work has been done or is being done. Federal funds have been used in this construction.

■ None of this, however, alters the segmentation issue in this suit. The work now being done has wholly separate utility than that planned in Clinton. Inside Baton Rouge, Louisiana 67, Plank Road, is a major throughway, serving an important local function. These newer projects really have no connection with the earlier S–187 projects and this later construction has singular utility irrespective of Louisiana 67's extended reach to Clinton and the Mississippi-Louisiana line.

The railroad crossing project cannot be considered major federal action. The Federal Highway Administration, in Federal-Aid Highway Program Manual, Vol. 7, Chap. 7, Sec. 2 (January 2, 1976), has defined "major action" as:

"... an action of superior, large and considerable importance, involving substantial planning, time, resources or expenditures...." (¶ 4b)

and

"Major actions are those of superior, large and considerable importance involving substantial planning, time, resources or expenditures. Any action that is likely to precipitate significant foreseeable alterations in land use; planned growth;

development patterns; traffic volumes; travel patterns; transportation services, including public transportation; and natural and manmade resources would be considered a major action. ..." (¶ 10d) (See, also, 23 C.F.R. § 771.3[b] and § 771.-9[d].)

■ In paragraph 10e are listed "nonmajor actions". Paragraph 10e(5) reads: "reconstruction of existing crossroad or railroad separations and existing stream crossings." The work performed on the crossing did not involve the degree of expense or kind of federal decision-making usually contemplated when the Act is invoked.

The same reasoning applies to bookkeeping or accounting transactions which have taken place since the effective date of the Act. The concern here, in particular, is with the dates of the final vouchers of the right-of-way projects. This is simply not major federal action. The decision to purchase the land and the actual sales occurred prior to the Act, and the federal officials did not exercise any discretion in closing out the books. This is merely the last required step in accounting. Cf. *Olivares, supra* at 1197, n. 9; *Robinswood Community Club v. Volpe*, 506 F.2d 1366, 1370 (9th Cir. 1974). The Act was not aimed at this type of federal action.

The original project north of Clinton was not implemented prior to January 1, 1970. However, in the 1970's Clinton to Mississippi was broken up into two projects and renumbered. Both of these projects were started and completed in the 1970's and the federal environmental requirements were fully met. It is this federal action to which plaintiffs point.

The Court finds that Louisiana 10 is a logical dividing line between the proposed Clinton-Olive Branch project and the completed construction immediately to the north.

---

**3.** It should be noted that on *secondary* aid projects there is no federal participation in these phases. The federal officials simply commit funds at "Stage 2" and make a final inspection after construction or even accept the state's certification of compliance with federal standards. It is undisputed, of course, that "Stage 2" approval is "major federal action." Here there is no evidence of any federal action involving the 4.5 mile Clinton-Olive Branch section of Louisiana 67 subsequent to the effective date of the Act.

The federal regulations establish criteria for determining the proper length of highway to be included in a single impact statement. Such a "highway section" should be a:

"highway development proposal between logical termini (population centers, major traffic generators, major crossroads, etc.) as normally included in a location study or multiyear highway improvement program." (23 C.F.R. § 771.3[g])

Further, it:

"should be as long as practicable to permit consideration of environmental matters on a broad scope and meaningful evaluation of alternatives. ... Piecemealing proposed highway improvements in separate EIS's is to be avoided. The highway section identified in the EIS or negative declaration should include the total length of highway between logical termini even though only a short length of the total identified highway section is proposed for construction or reconstruction within the multiyear work program." (23 C.F.R. § 771.5[a])

By comparison with other traffic arteries in more populated regions, Louisiana 10 might not be considered a "major traffic generator." However, in this rural area of Louisiana, the road carries a large percentage of the east-west traffic in East and West Feliciana Parishes and it meets the definition of a major crossroad. It should also be noted that there is a gap in Louisiana 67 at its junction with Louisiana 10. In Clinton, Louisiana 67 runs northward to Louisiana 10 where it makes a ninety-degree turn and overlaps with Louisiana 10 for a distance of two blocks. Louisiana 67 then makes another ninety-degree turn leaving Louisiana 10 and proceeding in a northerly direction.

The Town of Clinton is a population center within the meaning of 23 C.F.R. § 771.-3(g). It is a town of sufficient population and of considerable importance to the area. Clinton is the largest town on Louisiana 67 north of Baton Rouge. Even relatively small towns can serve as logical termini for a highway section. *Daly v. Volpe,* 514 F.2d 1106, 1109 (9th Cir. 1975).

The Court also concludes that Louisiana 67 north of Clinton and the Clinton-Olive Branch section have separate utility and serve different purposes. See *Named Individual Members of the San Antonio Conservation Society, supra; Indian Lookout Alliance v. Volpe,* 484 F.2d 11 (8th Cir. 1973).

Dean Gerald McLindon, who was accepted by the Court as an expert in the field of regional and urban planning with special skills in transportation planning, land use, landscape architecture and environmental assessment, testified that Louisiana 67 functioned primarily as a regional distributor highway, the main use of which was through traffic. In his opinion, Louisiana 67 served as a feeder road to other intersections and it had minimal local purpose. He also stated that the 4.5 mile stretch had no utility on its own but was an integral part of Louisiana 67. This small part of Louisiana 67 was a connective link in the highway's entire length and it, too, had an insignificant role as a local road. .

This testimony was largely uncontradicted and the Court accepts it with one major qualification. The traffic flow charts received into evidence show that the volume of traffic from Baton Rouge to Clinton along Louisiana 67 remains essentially constant. In 1977, approximately 4,500–5,000 vehicles traveled this route in a 24-hour period; at a point a few miles north of Clinton, volume decreased to 2,400 vehicles and near the state line to only 850. A traffic flow map of East Feliciana Parish dated 1974 shows that about 2,500 cars used Louisiana 67 from the East Baton Rouge Parish line to Clinton in a 24-hour period, while north of Clinton, traffic dropped to 1,200 vehicles per day, half of the volume south of Clinton.

These facts establish that Louisiana 67 really serves at least two and probably three distinct purposes. The part of Louisiana 67 south of Clinton provides a vital service to East Feliciana Parish irrespective of its extension to Mississippi. While the disputed segment is clearly an interwoven link of Louisiana 67 from Louisiana 10

south, it is not an interrelated part of the highway north of Clinton. Clinton-Olive Branch has little utility without the remainder of Louisiana 67 between Clinton and Baton Rouge, but this is not so for the stretch of Louisiana 67 north of Clinton. That part of Louisiana 67 (Plank Road) within Baton Rouge is completely different in function and use from either of the other two sections.

Louisiana 67 from Louisiana 10 to Mississippi meets the definition of a "highway section" in 23 C.F.R. § 771.3(g) in that it has logical termini at both ends, has separate utility and is a sufficient length of road from which to prepare an adequate and meaningful environmental impact statement. 23 C.F.R. § 771.5(a). The highway authorities were not required to include the Clinton-Olive Branch section in the environmental impact statement submitted prior to the construction of the projects north of Louisiana 10.

The evidence is contrary to the assertion that the entire length of Louisiana 67 from Baton Rouge to the state line must be treated as one integrated project. The highway could have been constructed between Baton Rouge and Clinton without any work being done past Clinton and it would still serve as an important route.

The Court holds that there has been no segmentation of this section from the projects to the north. Because of the division at Louisiana 10, federal participation in the projects north of Clinton does not link Clinton-Olive Branch to any major federal action nor require compliance with the provisions of the Act.

■ One additional comment must be made regarding the issue of segmentation. The record is entirely devoid of evidence that the state funding of this project was undertaken in an effort to evade federal environmental policy.[4] In fact, the evidence is to the contrary. The individual projects on this highway were programmed

long before the Act was conceived. The project adjoining the Clinton-Olive Branch project to the south was started in 1964 and final inspection came in 1969.

Although it can be argued that the disputed project does not have a logical terminus at its southern end under the formal criteria, it is not only logical but imperative to begin and end the project at the only remaining unimproved "highway section."

The evidence shows that Louisiana 67 was rebuilt in sections for sound administrative reasons, although "logical termini," as the term is now used, were not considered. The smaller the project, the less it will cost and the more likely it will be built. The Legislature is more likely to appropriate funds for a smaller project than for a larger project. Moreover, because roads can only be built one section at a time, the state does not program a large section of road when the actual work cannot be done for years and appropriated funds must sit idle. Small projects also insure that all available federal secondary aid money in a fiscal year will be spent. See The Federal-Aid Highway Program: Administrative Procedures and Judicial Interpretation, 2 ELR 50001, 50004–5.

There is no evidence that Clinton-Olive Branch was taken off the Federal-Aid Secondary System to avoid the Act. None of the witnesses could remember why this action was taken, but a memorandum dated January 22, 1969, from George A. Brandt, Jr., an engineering specialist with the Louisiana Department of Transportation and Development, stated that federal funds will not be used on this project because it does not meet Bureau of Public Roads safety requirements. This statement is supported by a similar memorandum from Frank Heroy, Interstate Engineer, Department of Highways, to Paul E. Lirette, Right-of-Way Engineer, Department of Highways, dated November 4, 1970. The safety requirements mentioned in these memoranda have nothing to do with the Act or the environ-

---

4. I should add that motives of the state authorities are by and large irrelevant to this inquiry since the law applies to those projects specified by the Congress without regard to intent of either state or federal authorities. This comment is made because plaintiffs have repeatedly implied such motives in brief.

ment. Ironically, the project does not meet federal highway standards because the state has reduced right-of-way width in an attempt to reduce environmental damage.

B. Federal "Imprimatur"

Plaintiffs also argue that federal participation in the development and progress of the project prior to its withdrawal from the secondary system has irrevocably "federalized" the project so that the federal presence cannot be removed.

Plaintiffs present three bases for this conclusion. First, they point to the fact that Louisiana 67 is on the Federal-Aid Secondary System. Using this fact alone, plus citing several definitions found in 23 U.S.C. § 101, et seq., it is asserted that Clinton-Olive Branch is a federal project as a matter of law. (See 23 U.S.C. §§ 101, 114.) Next, the potential of future federal funding and federal control is cited as a federalizing factor. Lastly, it is proposed that actual federal involvement, in particular, the obligation of $100,000 in federal money and federal approvals in 1967, has rendered this project subject to the terms and provisions of the Act.

The first two arguments are both contrary to the intent of the law and unsupported by judicial decision. Many miles of highway in Louisiana (and in other states) have been made a part of the Federal-Aid Secondary System. This step simply opens the option to use federal funds in the future and provides the state an opportunity to use federal funds on a certain project if the state decides to proceed in that manner. It is not a commitment on the part of the United States in any fashion and such a designation by the state does not constitute "major federal action."

Of many proposed projects eligible for federal funding, few actually receive federal funding for Louisiana secondary roads. W. T. Taylor, Assistant Secretary of the Louisiana Department, testified that Louisiana would receive between six and eight million dollars in Federal-Aid Secondary funds in 1978, which would fund only about three projects. (Deposition, p. 67)

Plaintiffs' interpretation of the Federal-Aid Highway Act would require federal approvals and review of projects which may never get any closer to federal control and funding than secondary designation ("Stage 1"). This was not the intent of the law. There is no federal action upon projects which never get past this initial stage. Simple designation of a project or length of highway on the Federal-Aid Secondary System does not trigger the need for compliance with the Act. Neither does Louisiana's 1941 action in giving Louisiana 67 secondary status now mandate compliance with the Act. *City of Highland Park v. Train*, 519 F.2d 681 (7th Cir. 1975), *cert. den.*, 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337 (1976).

Plaintiffs argue that the Court should consider that at some future time federal funds might be used to reimburse the state for the cost of the project. The absence of an impact statement, the focal point of this case, will effectively preclude that eventuality. Taylor testified, "We've gone beyond the point of no return." (Deposition, p. 69) In any event, *Atlanta Coalition v. Atlanta Regional Commission, supra*, apparently precludes using the hope of future federal funding as an argument for application of the Environmental Act. See 599 F.2d at 1347.

In the earlier development of the project, it was assumed that federal funding would eventually be requested, and it was originally programmed in accordance with federal standards and along the lines established by Louisiana's Secondary Road Plan. As previously pointed out, a public hearing was held in 1964 to consider the economic impact of the construction, and in the project agreement dated April 5, 1967, the federal government became obligated to reimburse Louisiana $100,000 for money spent on utility relocation and right-of-way acquisitions. On May 5, 1967, the agreement was cancelled. It is undisputed that prior to January 1, 1970, almost all of the remaining portions of Louisiana 67 south of Clinton had been improved with federal secondary aid funds.

Plaintiffs contend that these occurrences have so impressed this project with federal

"imprimatur" that to allow the state to withdraw it would be to permit a flagrant transgression in contravention of the aims and purpose of the Act.

■ Assuming that Louisiana 67 thus became "federalized," this occurred in 1967 before adoption of the Environmental Act and the highway also became "de-federalized" prior to adoption of the Act when the state cancelled the federal aid agreement on May 5, 1967. There is no federal action involved in the present state project and no federal action has been taken since 1967. Had Louisiana cancelled the agreement in 1971 instead of 1967, plaintiffs would have a much better argument. The federal law simply does not reach back to action taken in 1967.

### National Historic Preservation Act

■ The National Historic Preservation Act is also directed solely at federal agencies and federal action. *Miltenberger v. Chesapeake & Ohio Railway Company*, 450 F.2d 971 (4th Cir. 1971). Therefore, the Court's finding of no federal action with regard to the Environmental Act applies equally to the preservation statute.

The preservation law was adopted in 1966 and preceded the project agreement and "Stage 2" status of Clinton-Olive Branch (1967), but when these events occurred, the Brame-Bennett House was not included within the ambit of its protection. As originally written, the Act applied only to structures "included in the National Register." 16 U.S.C. § 470f. *Save the Courthouse Committee v. Lynn*, 408 F.Supp. 1323 (S.D. N.Y.1975); cf. *WATCH (Waterbury Action to Conserve our Heritage Incorporated) v. Harris*, 603 F.2d 310 (2d Cir. 1979), cert. den., 444 U.S. 995, 100 S.Ct. 530, 62 L.Ed.2d 426 (1979). It was not until 1976 that the statute was changed to read "included in or eligible for inclusion in the National Register." The Brame-Bennett House was not put on the National Register until 1973, six years after this project was returned to "Stage 1."

That Act, 16 U.S.C. § 470f, also requires federal involvement; it requires "a pro-posed Federal or federally assisted undertaking in any State" in order to trigger its provisions. As we have painstakingly pointed out, there is no federal action, undertaking or involvement in this Louisiana highway project. Under these circumstances, the preservation Act does not assist plaintiffs.

The Court has painstakingly reviewed all of the evidence in this case and no matter how viewed it does not establish federal involvement. The state authorities are solely responsible for the concept, design, funding and construction of the section of highway here involved. There is no present or future obligation of federal funds; no federal review or approval is required before, during or after construction; in short, there is no federal commitment of any sort to the project. There is, therefore, no "major Federal action" and no federal "undertaking" within the meaning of the statutes.

This Court has no power to interfere in any fashion with state highway construction projects in the absence of federal involvement.

For the foregoing reasons, there will be judgment herein against plaintiffs and in favor of defendants, DISMISSING this action and recalling, vacating and setting aside the writ of preliminary injunction previously issued.