SAVE BARTON CREEK ASSOCIATION, We Care Austin and Austin Crossroads, Plaintiffs–Appellees Cross–Appellants,

v.

FEDERAL HIGHWAY ADMINISTRATION (FHWA) and Texas State Department of Highways and Public Transportation, Defendants–Appellants Cross–Appellees,

and

MoPac South Transportation Corporation, Intervenor–Defendant Appellant–Cross–Appellee.

No. 91–8036.

United States Court of Appeals, Fifth Circuit.

Jan. 17, 1992.

Rehearing and Rehearing En Banc Denied Feb. 24, 1992.

Rodney D. Parrott, Marianne S. Dwight, Asst. Attys. Gen., Dan Morales, Atty. Gen., Austin, Tex., for Texas State Dept. of Highways, etc.

Jacques B. Gelin, David C. Shilton, U.S. Dept. of Justice, David F. Shuey, Dept. of Justice, Land & Natural Resources Div., General Litigation Section, Washington, D.C., for Federal Highway Admin. (FHWA).

J.B. Ruhl, Fulbright & Jaworski, Austin, Tex., for MoPac.

David O. Frederick, William G. Bunch, Austin, Tex., for plaintiffs-appellees cross-appellant.

Before CLARK, Chief Judge, WILLIAMS, and BARKSDALE, Circuit Judges.[*]

PER CURIAM:

Plaintiffs/appellees [1], Save Barton Creek Association, We Care Austin, and Austin Crossroads, three local environmental organizations, brought suit against the defendants/appellants, the Federal Highway Administration ("FHWA"), the Texas State Department of Highways and Public Transportation ("TDH"), and the MoPac South Transportation Corporation ("Corporation"), seeking to enjoin the construction of two highway projects in Austin, Texas. These projects are MoPac South and Segment 3 of a proposed Austin Outer Loop. The district court enjoined the appellants from all construction and development activities on MoPac South south of Hannon Lane and on the entire Austin Outer Loop pending their compliance with the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321–61 (1982). We reverse.

## I. FACTS AND PRIOR PROCEEDINGS

MoPac South and Segment 3 are two roadways planned and now partially constructed in a portion of southwest Travis County, Texas. MoPac South is a 5.5 mile southern extension of a north-south free-

---

[*] Chief Judge Clark participated in this decision prior to his resignation from the Court on January 15, 1992.

1. Note, the plaintiffs cross appeal on three narrow issues: 1) that the district court ignored their "unclean hands" argument to the defendants' equitable laches defense; 2) that the court erred by failing to order NEPA compliance for the year 2006 second phase of MoPac South; and 3) that the court erred in allowing the Corporation to intervene in this case. Since we reverse the district court's injunction, these issues are moot.

way, MoPac, located in West Austin. It was conceived in the early 1980's as a major radial roadway to serve South Austin. Also conceived in the early 1980's, the Austin Outer Loop is a proposed 82 mile circumferential freeway which in planning has been divided into five segments. The segment which is to be built in the southwest corridor of the Austin Outer Loop has been designated by the TDH as Segment 3, the second roadway project in dispute. Segment 3 is the portion of the contemplated Austin Outer Loop which will intersect with the southern terminus of MoPac South. Both of these highways, MoPac South and Segment 3, traverse the Austin-area Edwards Aquifer, a sole source drinking water aquifer in southern Travis and northern Hays Counties, southwest of Austin.[2]

The appellees instituted this suit for declaratory and injunctive relief requesting a declaration that the Austin Outer Loop, including Segment 3, and MoPac South were "major Federal actions" for the purposes of NEPA and required the preparation of a regional environmental impact statement ("EIS") prior to their construction. The appellees alleged that the FHWA was in violation of NEPA for allowing continued construction of MoPac South when it was tied in with the rest of MoPac, which was built with federal aid, and also in planning for the construction of the Austin Outer Loop. Furthermore, specifically

with regard to the Austin Outer Loop, they asserted that the FHWA allowed the project's unlawful segmentation. Additionally, the appellees argued that the state defendants, the TDH and the Corporation, were acting to frustrate federal environmental law by characterizing the most environmentally sensitive segments of these highway projects as state projects exempt from NEPA. The appellees also contended that the failure to prepare a regional environmental impact statement ("EIS") under NEPA on the Austin Outer Loop would result in irreversible contamination of the Edwards Aquifer, causing a significant hazard to public health.

After conducting a fact intensive bench trial[3], the district court concluded that commencing construction of Segment 3 without NEPA compliance was improper because the Austin Outer Loop was a proposal for "major Federal action." Thus, Segment 3 could not be segmented from the overall proposal and funded separately prior to completion of the environmental assessment process on the entire Austin Outer Loop pursuant to NEPA. With regard to MoPac South, the district court held that since it had been planned for construction as a part of Segment 3, itself an integral part of a federal project, MoPac South "must necessarily be an integral part of a federal project and subject to NEPA." Furthermore, MoPac South was subject to

**2.** We sketch a factual overview of the case here, reserving a further detailing of the facts for our analysis below.

**3.** Prior to the bench trial, the parties filed a proposed agreed pretrial order containing extensive stipulation of facts. On appeal, a controversy ensued concerning the stipulations. The stipulations on record are divided generally into three groups: stipulations # 1–50, stipulations # 61–63, and stipulations # 64–299. The appellees assert that the district court did not accept the proposed pretrial order for stipulations # 61–299, and thus, the stipulations are largely moot. In essence, according to the appellees, this Court need not expend effort examining the proposed stipulations. In contrast, the appellants contend that, while the district court did not sign the pretrial order, it was duly filed and entered. Furthermore, the district court's memorandum opinion and order was based on the testimony and evidence presented and upon consideration of the arguments of counsel; that

body of record evidence included numerous references to the parties' stipulations. Additionally, throughout the bench trial, the district court permitted counsel freely to refer to the stipulations.

At no point before, during, or after the trial did the district court state or imply that it would not accept the stipulations generally or had rejected them specifically. Ultimately, according to the appellants, the appellees have demonstrated no good reason to depart from the accepted rule that matters which are stipulated in the pretrial order are binding upon the parties, absent some modification, and usually cannot be pursued on appeal. Our review of the record also indicates that the appellees themselves utilized the same stipulations they asserted should be rendered largely moot. Consequently, this Court has applied all the stipulations as relevant.

NEPA "because the project is an extension of a federal project (MoPac), a connection of three federal projects (MoPac, U.S. 290, and the Austin Outer Loop), and it lacks substantial independent utility." Additionally, intimating but in no way describing or making findings about some surreptitious actions on the part of the appellants, the district court alluded to "the questionable nature of the TDH's activity" as well as to the fact that "the evidence does not reveal any measurable good will on the State's part."

In addressing the extent of the injunctive relief, the district court acknowledged the futility of enjoining the construction of MoPac South from U.S. 290 to Slaughter Lane, which was 96% complete, and the construction of MoPac South from Slaughter Lane to Hannon Lane, which was 42% complete. All construction on the Austin Outer Loop and MoPac South south of Hannon Lane, however, was enjoined until the completion of the procedures provided under NEPA for "major Federal action." The district court conceded it could not determine the requisite environmental studies needed to be conducted on the projects. The court simply asserted that it trusted that the federal law could define the requirements of the NEPA EIS. Though it recognized that it lacked the high level of technical expertise to determine whether a regional EIS was necessary, the court did order TDH to prepare an EIS on Segment 3. The district court did not disturb in any way an earlier finding it had made that there was no evidence with respect to environmental injury resulting from construction of Segment 3 and MoPac South.[4]

## II. DISCUSSION

The appellants advance three basic contentions. First, they urge that the appellees' claims are not ripe for judicial review because there has been no "final" administrative action that would permit construction of the proposed highway projects using federal funds. Second, they assert that the TDH has been solely responsible for the planning, design, and construction of both MoPac South and Segment 3 of the Austin Outer Loop. Since state-funded projects are not controlled by FHWA and in no way obligate the federal government to any present or future acts, the highway projects cannot be labeled as "major Federal actions" for the purposes of NEPA. Third, the appellants concede that case law and the FHWA regulations do establish that under certain circumstances, segmentation of federal-aid highway projects can be improper under NEPA. According to the appellants, however, in applying these principles to these projects it is apparent that neither MoPac South nor Segment 3 of the Austin Outer Loop has been improperly segmented from a federal-aid highway project.

### A. Ripeness

■ According to the appellants, this case cannot be ripe for judicial decision absent a final action by the FHWA. Judicial review of federal agency action is governed by the requirement of Section 10(c) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 704 (1982), which provides that only "final agency action" is subject to judicial review. See, e.g., Lujan v. National Wildlife Fed'n, ── U.S. ──, 110 S.Ct. 3177, 3185, 111 L.Ed.2d 695 (1990). The appellants contend that even if one assumes for argument's sake that the district court could have found that NEPA does apply in this case, the FHWA has taken no final action upon which to base APA review as to either MoPac South or any part of a proposed Austin Outer Loop. The FHWA has not approved a draft EIS for public circulation, a final EIS, a location, or funding for any part of either Mo-

---

**4.** At a hearing for a preliminary injunction, the district court heard testimony of the appellees' own expert that no documented case exists in which a highway construction has ever contaminated an aquifer. Furthermore, none of the witnesses were able to offer substantiated evidence of injury to the aquifer. The appellees had relied on the fact that the aquifer has been designated a sole source drinking aquifer, and thus vulnerable to contamination. Ultimately, although the court recognized the aquifer's vulnerability, it found that the appellees had failed to prove substantial threat of irreparable injury if the injunction was not granted.

Pac South or Segment 3 of the Austin Outer Loop.

We recognize that the requirement of finality has been applied in actions seeking to enjoin on environmental grounds the construction of highways. The appellants point to several cases in which the rule requiring finality and the related and overlapping doctrine of ripeness have been exercised to conclude that court intervention would not only be a waste of judicial resources, but also improper interference in the administrative process. *Ash Creek Mining Co. v. Lujan,* 934 F.2d 240, 243 (10th Cir.1991) (finding Ash Creek's action unripe for judicial review because it has failed to show that the "Department [of Interior]'s *proposed* exchange of the Ash Creek Coal Leasing Tract for the Whitney Benefits Tract constitutes 'final agency action'") (emphasis in original); *Environmental Defense Fund, Inc. v. Johnson,* 629 F.2d 239, 241 (2d Cir.1980) (concluding that the Corps of Engineers' issuance of a recommendation report of further study of the Hudson River Skimming Project not yet under construction could not be characterized as a "final agency action"); *Eastern Connecticut Citizens Action Group v. Dole,* 638 F.Supp. 1297, 1299–1300 (D.Conn.), *aff'd per curiam,* 804 F.2d 804 (2d Cir.1986), *cert. denied,* 481 U.S. 1068, 107 S.Ct. 2460, 95 L.Ed.2d 869 (1987) (finding the claims not ripe for judicial review because, *inter alia,* no construction had begun on proposed Relocated Route 6).

These cases are properly distinguishable from the case on appeal. Our decision does not resolve a dispute concerning "a hypothetical highway"; we are not "adjudicating the legality of non-events." *See National Wildlife Fed'n v. Goldschmidt,* 677 F.2d 259, 263 (2d Cir.1982). This case involves concrete disputes over tangible interests having immediate and practical impact. We acknowledge that the two projects at issue may become a part of a larger project. But that project may never come to fruition. At this stage, Segments 1, 2, 4, and 5 of the Austin Outer Loop are merely tentative, preliminary, and at best contemplated actions. We must address the issues raised, however, because they arise from the portions of the proposed larger project which have been or are being built.

As of the date of the district court's decision, construction of MoPac South from U.S. 290 to Slaughter Lane was 96% complete, and construction of MoPac South from Slaughter Lane to Hannon Lane was 42% complete.[5] Additionally, construction of Segment 3 was approximately 10% complete. We are governed by the finality requirement which is to be interpreted in a "pragmatic way." *Abbott Lab. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1516, 18 L.Ed.2d 681 (1967). We hold that this case cannot be dismissed on ripeness grounds. These projects have left the drawing board and have entered varied stages of construction. Thus, we turn to the question of whether these projects fall within the purview of NEPA.

**B. *Major Federal Action***

 The district court's ruling that NEPA applies to MoPac South and Segment 3 stems from an erroneous legal conclusion that the Austin Outer Loop constitutes a " 'proposal for major [F]ederal action' subject [to] an environmental document." NEPA requires that federal agencies consider the environmental consequences of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The requirements of NEPA, which include, among other things, the submission of an EIS, apply only when the federal government's involvement in a project is sufficient to constitute "major Federal action."[6]

---

5. Furthermore, as the district court acknowledged, the TDH has expended over $10,000,000 in the construction of MoPac South and the Corporation has donated over $10,000,000 worth of right-of-way and services to the state for MoPac South.

6. The statutory and regulatory criteria for federal-aid highway funding is an elaborate, intricate scheme. Title 23 of the United States Code sets forth the legal framework for the federal-aid highway program, which is, in reality, a federally assisted state program. 23 U.S.C. § 145 (1988). The states own, construct, and maintain

Thus, the dispositive issue in this case is whether at this juncture sufficient federal involvement exists in the Austin Outer Loop Project to constitute "major Federal action" affecting the environment under NEPA. We are cognizant that "[t]he purpose of NEPA is to require that *federal* decision-makers consider the environmental consequences of *their* actions before deciding to proceed." *Swain v. Brinegar,* 542 F.2d 364, 369 (7th Cir.1976) (en banc) (emphasis added).

■ No litmus test exists to determine what constitutes "major Federal action." Furthermore, "[f]ederal courts have not agreed on the amount of federal involvement necessary to trigger the applicability of NEPA." *Village of Los Ranchos de Albuquerque v. Barnhart,* 906 F.2d 1477, 1480 (10th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991). Yet both the federal regulations and the courts have attempted to provide guidance as to what constitutes "major Federal action."

■ The Council on Environmental Quality ("CEQ") has issued regulations defining "major Federal action." These regulations are entitled to substantial deference. *Andrus v. Sierra Club,* 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979).

The regulations provide that "major Federal action" encompasses not only actions by the federal government, but also actions by nonfederal actors "with effects that may be major *and which are potentially subject to Federal control and responsibility.*" 40 C.F.R. § 1508.18 (1991) (emphasis added). The district court placed heavy reliance on this regulation in making its determination that the Austin Outer Loop is a "major Federal action."

■ We recognize that "major Federal action" can exist when the primary actors are not federal agencies. Nonetheless, the district court appears to have placed undue reliance on only a portion of the CEQ's regulation by focusing solely on the "potentially subject" factor, while dismissing with seeming facility the "Federal control and responsibility" factor. "[T]he distinguishing feature of 'federal' involvement is the ability to influence or control the outcome in material respects. The EIS process is supposed to inform the decision-maker. This presupposes [the decision-maker] has judgment to exercise. Cases finding 'federal' action emphasize authority to exercise discretion over outcome." W. Rodgers, Environmental Law § 7.6, at 763 (1977).

the highways which form the federal-aid highways within their borders. The state's incremental stages of highway construction are included in the state's programs of projects which are submitted to the FHWA for approval pursuant to 23 U.S.C. § 105. Section 105 of 23 U.S.C. provides that a state desiring to avail itself of the benefits of federal assistance must submit to the FHWA a program of projects for which federal aid may be sought, known as the "105 Program." Recognizing that a state ultimately may not seek federal aid for some projects on a 105 Program, the FHWA regulations contemplate early environmental coordination between the state and the FHWA, prior to the state's actual proposal and request for federal funding assistance. 23 C.F.R. § 771.111.

Programs may be approved in whole or in part, but the FHWA is prohibited by law from approving any project on a proposed program which is not part of an approved federal-aid system. Program approval does not constitute an obligation of funds, or establish a date of eligibility for federal funding. 23 C.F.R. § 630.-112(c) (1991). If a project is to be federally funded, however, it must first be listed on a

program approved by the FHWA. In addition to being part of an FHWA approved federal-aid highway system and included in an approved Section 105 Program, a project must also meet the requirements of environmental regulations to qualify as an FHWA project. Under the FHWA regulation, a project cannot be eligible for agency funding unless: it is determined to be a categorical exclusion (need not be subject to environmental analysis); is found to have no significant impact as a result of an environmental assessment; or is the subject of an FHWA approved final EIS and record of decision. 23 C.F.R. § 771.113. Furthermore, for a highway to qualify for federal-aid funding, it must also have its plans, specifications, and estimates approved by the FHWA, and receive prior concurrence from the FHWA before the award of the construction contracts.

None of these requirements has been met by either MoPac South or any segment of the Austin Outer Loop. Accordingly, neither project is presently eligible for federal funding, and neither is a federal-aid highway project subject to NEPA as a result of asserted FHWA involvement.

In an attempt to find the requisite amount of federal involvement necessary to trigger the applicability of NEPA, some courts have echoed the CEQ's regulations and the suggestions of commentators, and asserted that the touchstone of "major Federal action" constitutes a federal agency's authority to influence nonfederal activity. "[T]he federal agency must possess actual power to control the nonfederal activity." *Sierra Club v. Hodel,* 848 F.2d 1068, 1089 (10th Cir.1988). *See, e.g., Atlanta Coalition on the Transp. Crisis, Inc. v. Atlanta Regional Comm'n,* 599 F.2d 1333, 1347 (5th Cir.1979) (federal funding assistance for local planning process does not alone constitute "major Federal action" where all decisions are entrusted to the state and local agencies).[7] Ultimately, "we do not quarrel with the proposition that federal involvement can in some circumstances be so massive, so pervasive, that 'the acts of the state are in reality federal actions.'" *Atlanta Coalition,* 599 F.2d at 1346 (citation omitted).[8]

The extensive record on appeal, however, fails to show any evidence of any significant federal involvement, much less "massive" involvement. At the present time, work on MoPac South and Segment 3 of the Austin Outer Loop has progressed through right-of-way acquisition to construction without FHWA approval or funding. Furthermore, state and local funding of these projects can never be reimbursed by the FHWA because the state did not obtain prior authorization from the FHWA for the expenditure of funds, did not obtain FHWA approval of plans, specifications and estimates, and did not obtain concurrence from the FHWA before awarding the construction contracts. 23 U.S.C. §§ 106, 112(d) (1988); 23 C.F.R. § 1.9(a) (1991).

In actuality, no federal funds have been requested or spent, and no federal approvals have been given. The state is simply building some highways for its own use. Of particular importance is the fact that the federal authorities strongly disavow any interest in these highways. They also are appellants with the state officials in this case. The only federal touching of the projects at all consists of state officials taking advantage of the FHWA's early coordination procedure and beginning to compile NEPA compliance documentation so as to preserve state eligibility for federal funding.

Though the district court acknowledged that "[t]he mere prospect of future federal funding is not enough," it did take specific notice that according to the "Current Status Report" on the Austin Outer Loop, Segments 1, 2, 4, and 5 "are headed for some federal funding." Furthermore, the court specifically referred to testimony from a TDH engineer that at the estimated cost of the Outer Loop, somewhere between $400 and 800 million, the project is "'not likely' [to] be funded by the state alone." Additionally, although the district court recognized that the TDH has not requested any federal aid for any section of the Austin Outer Loop, it found the probability of a request for federal funding "too great" to allow the TDH to construct one portion of the Austin Outer Loop without following federal law. This Court has recognized, however, that "the possibility of federal funding in the future for a project or group of projects does not make that project or projects 'major [F]ederal action' during the planning stage." *Atlanta Coalition,* 599 F.2d at 1347 (citations omitted). *See also City of Boston v. Volpe,* 464 F.2d 254, 258 (1st Cir.1972) ("[T]he adoption of

---

**7.** Another characterization of this control factor is whether federal involvement in a nonfederal project is sufficient to "federalize" the project for purposes of NEPA. *See, e.g., Maryland Conservation Council, Inc. v. Gilchrist,* 808 F.2d 1039 (4th Cir.1986); *Winnebago Tribe of Nebraska v. Ray,* 621 F.2d 269 (8th Cir.), *cert. denied,* 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980). The appellees contend that both Segment 3 and MoPac construction should not commence prior to a NEPA analysis because the

number of federal controls on both projects is adequate to "federalize" them.

**8.** A less pervasive view is that a highway project constitutes a "major Federal action" upon receipt of location approval from the FHWA. *See, e.g., City of Boston v. Volpe,* 464 F.2d 254 (1st Cir.1972); *Lathan v. Volpe,* 455 F.2d 1111 (9th Cir.1971); *Sierra Club v. Volpe,* 351 F.Supp. 1002 (N.D.Cal.1972).

certain federal standards and specifications in the hope of qualifying for federal assistance cannot transform a state or local project into a federal one").

■ Furthermore, even if the district court were correct that the state contemplates constructing some of the speculative Austin Outer Loop with federal funds, it does not follow that an EIS is now required. Until there has been a "proposal,"[9] and until there has been a "recommendation or report" on that proposal, there is no requirement for an EIS.[10] *Kleppe v. Sierra Club*, 427 U.S. 390, 405–06, 96 S.Ct. 2718, 2728, 49 L.Ed.2d 576 (1976) (quoting *Aberdeen & Rockfish R. Co. v. SCRAP*, 422 U.S. 289, 320, 95 S.Ct. 2336, 2356, 45 L.Ed.2d 191 (1975)). The "proposal" requirement, then, is a statutory requirement grounded in the language of Section 102(2)(C) of NEPA that governs the time when an EIS should be prepared. In essence, the appellees can prevail only if there has been a report or recommendation on a proposal for "major Federal action" with respect to MoPac South and Segment 3 as part of a possible future Austin Outer Loop. In concluding that the Austin Outer Loop is a "proposal" for "major Federal action," the district court incorrectly elevated FHWA's early coordination process to the status of a "proposal" under NEPA.

Our scrutiny of the record shows that neither MoPac South nor any segment of the Austin Outer Loop, including Segment 3, has yet acquired the status of a formal proposal requiring federal approval. The district court placed much emphasis on the state's preliminary planning steps taken on the two projects, particularly the state's early compliance with the eligibility requirements for federal funding for MoPac South and Segment 3.

Initially, the TDH explored the possibility of making MoPac South eligible for § 105 Program federal-aid funding. Accordingly, the TDH submitted an environmental assessment ("EA")[11] for MoPac South to the FHWA's Division Office in Austin. The TDH's submission determined that MoPac South, if federal funds were sought, would warrant the preparation of a NEPA EIS. However, the FHWA never committed nor reimbursed any funds for the planning, design, right-of-way acquisition, or construction of MoPac South. Additionally, in September 1988, the FHWA informed TDH that MoPac South was ineligible for federal funding because it was not then on any federal aid system. In essence, though the TDH originally contemplated potential federal involvement, nothing ever came to fruition. The TDH planned the location and design of MoPac South without FHWA overview or approval. Although there was some preliminary consideration during the early developmen-

---

9. A "'[p]roposal' exists at that stage in the development of an action when an agency subject to [NEPA] has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated." 40 C.F.R. § 1508.23 (1991).

10. The Congress authorizes and directs that, to the fullest extent possible: ... (2) all agencies of the Federal Government shall—

 \* \* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the *proposed* action,

(ii) any adverse environmental effects which cannot be avoided should the *proposal* be implemented,

(iii) alternatives to the *proposed* action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the *proposed* action should it be implemented.

NEPA § 102, 42 U.S.C. § 4332 (emphasis added); *see also* 40 C.F.R. § 1508.12 (1991) (defining "federal agency"); *id.* § 1508.18 ("major Federal action"); *id.* § 1508.27 ("significantly"); *id.* § 1508.3 ("affecting"); *id.* § 1508.14 ("human environment").

11. An environmental assessment is a brief public document that, *inter alia,* provides "sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1).

tal stage of an application for federal funds, the project became purely a function of the state.

With regard to Segment 3, the TDH prepared an overview environmental assessment ("OEA") for the Austin Outer Loop, stating the history of the project, the need for it, and potential alternatives to the project. The OEA also established that the Austin Outer Loop would be divided into four segments for planning and development purposes. Intending to preserve federal aid eligibility for the Austin Outer Loop segments, the TDH submitted the OEA to the FHWA in 1986 for early NEPA coordination analysis. The FHWA approved the OEA in January 1987. The FHWA subsequently announced that the Austin Outer Loop would be segmented into multiple segments for the purposes of design, planning, environmental review, and construction approval. 52 Fed.Reg. 32,090 (Aug. 25, 1987).

Since the August 1987 *Federal Register* segmentation announcement, the Austin Outer Loop has undergone two re-segmentations. In September 1987, TDH approved a re-segmentation of the original Segment 3 into 3A and 3B, and subsequently informed the FHWA of its actions. Expressing concern about the proposed re-segmentation, the FHWA continued collaborating with the TDH to make the segments meet the requirements to maintain federal funding eligibility. Ultimately, the TDH concurred with the FHWA's suggestion to divide the Austin Outer Loop into five segments, each ending at major radial roadways. This proffered segmentation is the current division of the proposed Austin Outer Loop. In essence, the only control FHWA has exercised to date over the Austin Outer Loop is the suggestion of its re-segmentation in order for TDH to retain eligibility for federal aid funds. Segment 3

is just one of many state projects that has federal assistance at an exploratory stage and then is completed wholly through state funding.

Upon reviewing the record, particularly the evidence found persuasive by the district court,[12] we find that none of the early coordination activities by the state with the federal government constitute the requisite "major Federal action." The crux of the district court's opinion was a determination that the Austin Outer Loop is a " 'proposal for major [F]ederal action.' " Having made that assessment, it rather cursorily concluded that Segment 3 is an integral part of a federal project, as is MoPac South, since it was planned for construction as part of Segment 3.

Because of the district court's complete reliance on the Austin Outer Loop as a "major Federal action," some further evaluation of the status of the Austin Outer Loop is necessary. Major construction projects, like the Austin Outer Loop, customarily change in design, cost, scope, and impact over the years required for development. The segments of the Austin Outer Loop are planned to be constructed at different times in the future over a period of many years. Furthermore, the financing, specific location, and construction timing of other segments are subject to change. More important, some segments of the Austin Outer Loop may never be built. In essence, the construction of an outer loop around Austin is, at most, a contemplated action, which at this point exists only as a concept in a long range plan that is subject to constant revision. The record is silent with regard to any meaningful federal participation or control exercised over the project in this case. There has been no federal commitment and only minimal federal intervention.

---

**12.** The appellees were also significantly influenced by the state's early coordination actions. They attempted to contest the "proposal" notion by simply stating that the Austin Outer Loop project had "reached a very highly defined level prior to suit." According to the appellees, the project was sufficiently defined to support the FHWA's "very public announcement of NEPA environmental impact statements"; it was suffi-

ciently defined to support FHWA approval of a NEPA environmental assessment; and finally, by the time of trial, NEPA EISS were being drafted for all segments except Segment 3. Of course, the preliminary drafting of an EIS is a step far removed from federal approval, and indeed may be used by the state to make its own environmental evaluation.

Since the FHWA has at this time given no approvals—whether it be approval of a final EIS, approval of design, approval of location, or approval of funding—there has been no "major Federal action" in connection with any segment of the Austin Outer Loop. The "federal imprimatur" that sometimes attaches to state projects is simply not present in this case. *Hawthorn Envtl. Preservation Assoc. v. Coleman,* 417 F.Supp. 1091 (N.D.Ga.1976), *aff'd per curiam,* 551 F.2d 1055, 1056 (5th Cir.1977). A state may, after all, proceed with construction of its projects wholly independently of the federal government.

Our holding today is consistent with other recent precedent. In *Macht v. Skinner,* 916 F.2d 13, 16 (footnote omitted) (D.C.Cir. 1990), the Court held that while the Urban Mass Transportation Administration ("UMTA") had given Maryland $2.5 million for preliminary engineering studies and environmental impact statements for the proposed extensions to the Light Rail Project, and while Maryland had to obtain an Army Corps of Engineers permit, these facts were insufficient "to transform the entirely state-funded Light Rail Project into 'major [F]ederal action' affecting the environment within the meaning of NEPA." Furthermore, the Court was unpersuaded by the contention that the project constituted "major Federal action" because Maryland had hoped to obtain a $40 million UMTA grant to build extensions to the state project sometime in the future. According to the Court, "in this era of federal fiscal shortcomings there is a wide gulf between what a state may want and what the federal government is willing to provide." *Id.* at 17 (citing district court memorandum opinion). The D.C. Circuit Court rejected requiring NEPA environmental consideration at a far higher threshold of federal activity than is present in the case before us.

The Tenth Circuit made a similar determination in *Village of Los Ranchos de Albuquerque v. Barnhart,* 906 F.2d 1477 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991). Faced with a state-planned highway bridge project which had retained eligibility for federal funding, the Court rejected the contention that the FHWA's assistance in, and approval of, the EIS was sufficient to make the bridge project a "major Federal action" within the purview of NEPA. Further, and relevant to our case, the Court asserted:

> Congress has not applied NEPA to all highways that the states are *eligible* to fund with federal dollars.... The State's option to use federal dollars, though open virtually until the concrete is poured, is nonetheless an option, and the State's choice should not be restricted simply because one alternative option (using state dollars) might result in less adequate assessment of environmental considerations. If the highway is not a federal action, then a state's decision to avoid federal involvement cannot have the paradoxical effect of establishing federal involvement.

906 F.2d at 1481 (quoting *Citizens for Balanced Env't & Transp., Inc. v. Volpe,* 376 F.Supp. 806, 812–13 (D.Conn.), *aff'd,* 503 F.2d 601 (2d Cir.1974), *cert. denied,* 423 U.S. 870, 96 S.Ct. 135, 46 L.Ed.2d 100 (1975) (emphasis in original)). Here again the Court found that a much higher level of federal commitment and involvement than that present in the case before us (an EIS having been prepared and approved) as insufficient to constitute "major Federal action."

The appellees assert that the mechanistic approach to "federal" status advocated by the appellants, the FHWA, the TDH, and the Corporation, would make NEPA a "dead letter law for highway projects." We disagree. To the contrary, the appellants are merely adhering to the law and are recognizing that Congress limited the EIS requirement to "major Federal actions." "Although desperate environmental plaintiffs have attempted to convert NEPA into a national land use statute, Congress did not intend section 102(2)(C) to apply to actions undertaken by state, local, or private concerns without any federal participation or approval." McGarity, *The Courts, the Agencies, and NEPA Threshold Issues,* 55 Tex.L.Rev. 801, 837 (1977) (footnote omitted). *See also Movement Against Destruction v. Volpe,* 361 F.Supp.

1360, 1383 (D.Md.1973), *aff'd,* 500 F.2d 29 (4th Cir.1974) ("Despite the breadth of the NEPA, its application is only to the decision making processes of the Federal government.") (citation omitted).

In sum, the error of the district court lies in concluding that these two highway projects are an integral part of an Austin Outer Loop. The outer loop does not exist except in speculative plans for years ahead. The federal authorities as well as state authorities recognize this. The undisputed facts are that Segment 3 and MoPac South have been financed with non-federal funds and have been designed and built without federal approval and authorization. We hold that these projects do not constitute nor are they are part of any project constituting "major Federal action" within the contemplation of 42 U.S.C. § 4332(2)(C).

## C. *Segmentation*

■ We have recognized that the proposed Austin Outer Loop as yet has not even achieved a nascent state. Both federal and state governments agree that this is not a highway plan for an outer loop which can at the present time be classified as a "major Federal action" and also be eligible for federal aid.

There remains the assertion that the state has chosen the most environmentally sensitive segment of this highly tentative plan for immediate construction without federal aid for the purpose of avoiding NEPA. While the district court hinted at this possibility, it did not so hold and did not make findings that would support it.[13]

The case law which deals with such improper segmentation almost always involves a situation where a "major Federal action" is found to exist and *then* the seg-

mentation is evaluated as an escape from the NEPA application which is otherwise immediate.[14] *See, e.g., Macht v. Skinner,* 916 F.2d 13, 16 n. 4 (D.C.Cir.1990) ("Because we hold that the Light Rail Project does not involve 'major [F]ederal action,' we do not decide whether the district court correctly held that Maryland's segmentation of the Project was proper."). Segmentation cases consider only whether a federal project has been improperly segmented to avoid compliance with NEPA. *See, e.g., Coalition on Sensible Transp., Inc. v. Dole,* 826 F.2d 60 (D.C.Cir.1987); *Swain v. Brinegar,* 542 F.2d 364 (7th Cir.1976) (en banc); *Indian Lookout Alliance v. Volpe,* 484 F.2d 11 (8th Cir.1973).

The possibility does exist, however, that a state could improperly segment out critical portions of a proposed project before the project was developed to the stage of becoming a "major Federal action." By this means, a state could circumvent those segmentation actions which would be found to be illegal if the project were developed to the "major Federal action" stage. Segmentation analysis functions "to weed out projects which are pretextually segmented, *and* for which there is no independent reason to exist. When the segmentation project has *no* independent jurisdiction, no life of its own, or is simply illogical when viewed in isolation, the segmentation will be held invalid." *Macht v. Skinner,* 715 F.Supp. 1131, 1135 (D.D.C.1989) (emphasis in original), *aff'd,* 889 F.2d 291 (D.C.Cir. 1989) (Table). Further, in *Village of Los Ranchos de Albuquerque,* the Tenth Circuit distinguished its case from a case in which local defendants were involved "in a sham transaction to evade federal environmental requirements." *Id.* at 1482. We

---

**13.** Without specifically accusing the state of covert or surreptitious actions, the district court stated that TDH's "intentions regarding Segment 3 may have been on the 'up and up': however, the evidence does not reveal any measurable good will on the State's part." Perhaps the district court by this wording was trying to avoid a harsh statement of criticism of the state officials. But the fact must be faced that the lack of proof of "measurable good will" has no legal significance. The record reveals no proof of ill-will or impropriety.

**14.** Short of a completely exhaustive search, we found only two cases in which there was an evaluation of segmentation without a finding of "major Federal action." *See Village of Los Ranchos de Albuquerque v. Barnhart,* 906 F.2d 1477 (10th Cir.1990); *Macht v. Skinner,* 715 F.Supp. 1131 (D.D.C.1989), *aff'd,* 889 F.2d 291 (D.C.Cir.1989) (Table) (an earlier decision in a related case to the case referred to in the immediately following text).

consider whether such a subterfuge by the state occurred.

In making its determinations, the district court relied heavily on *Hawthorn Environmental Preservation Association v. Coleman*, 417 F.Supp. 1091 (N.D.Ga.1976), *aff'd per curiam*, 551 F.2d 1055 (5th Cir.1977) and *Named Individual Members of San Antonio Conservation Society v. Texas Highway Department*, 446 F.2d 1013 (5th Cir.1971), *cert. denied*, 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972) (hereinafter *San Antonio I*). This reliance was pivotal. The district court may have felt compelled to find a probability of "major Federal action," so as to curtail the result of what it perceived as a "naturally suspect" motive—the segmentation of the Austin Outer Loop at the portion which traverses the Edward's Aquifer. The trial court's inexorably intertwined analysis of "major Federal action" and segmentation requires this Court to address the issue of segmentation even though there is strong case authority that segmentation does not become an issue until "major Federal action" is established.

"Segmentation" or "piecemealing" is an attempt by an agency to divide artificially a "major Federal action" into smaller components to escape the application of NEPA to some of its segments. This claim is a major part of the charge made by plaintiffs in this case. "As a general rule under NEPA, segmentation of highway projects is improper for purposes of preparing environmental impact statements." *Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 439 (5th Cir. Unit B 1981). Segmentation becomes suspect, however, only after an evaluation of such factors as whether the proposed segment (1) has logical termini; (2) has substantial independent utility; (3) does not foreclose the opportunity to consider alternatives; and (4) does not irretrievably commit federal funds for closely related projects.[15] *See, e.g., Piedmont Heights*, 637 F.2d at 439; *San Antonio I*, 446 F.2d at 1024–26. In the context of a highway within a single metropolitan area, as the case at issue—as opposed to projects joining cities—courts have focused more on the factor of "independent utility." *See, e.g., Coalition on Sensible Transp.*, 826 F.2d at 69; *Piedmont Heights*, 637 F.2d at 440. Consequently, our analysis, while assigning the other factors their modest weight, will focus primarily on the "independent utility" factor. *See Association Concerned About Tomorrow, Inc. v. Dole*, 610 F.Supp. 1101, 1108 (N.D.Tex. 1985) ("the illogic of a terminus is at best a secondary inquiry, shadowed by the independent utility inquiry") (citation omitted).

With these considerations in mind, we address *Hawthorn* and *San Antonio I*. Contrary to the district court's determination, we find that these cases posit significant and controlling differences with our present case.

In *Hawthorn*, the construction of a bypass of the City of Newnan, Georgia, was at issue. To perform its intended function, the entire bypass had to be constructed. The bypass had been conceived as one project and its two segments, Phase I and Phase II, were proposed to be constructed simultaneously. It was also clear that absent the construction of Phase II, the segment proposed for federal funding, Phase I, the state funded segment, would not be constructed because it could not be utilized. The court, acknowledging the "sufficiently

---

**15.** These factors are embodied in the FHWA's NEPA implementation regulations.

(f) In order to ensure meaningful evaluation of alternatives and to avoid commitments to transportation improvements before they are fully evaluated, the action evaluated in each EIS or finding of no significant impact (FONSI) shall:

(1) Connect logical termini and be of sufficient length to address environmental matters on a broad scope;

(2) Have independent utility or independent significance ...; and

(3) Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.

23 C.F.R. § 771.111(f) (1991). Of course, absent a finding of "major Federal action," these criteria do not apply. They apply only "to actions where [FHWA] exercises sufficient control to condition the permit or project approval. Actions taken by the applicant which do not require Federal approvals ... are not subject to this regulation." *Id.* at 771.109(a)(1).

great prospects" of Phase II becoming 'major Federal action,' " focused on the question of segmentation. 417 F.Supp. at 1101. It found that absent any persuasive evidence of independent utility, "the defendants had violated the mandates of federal environmental law and policy by failing to conduct proper studies concerning the construction of [Phase I] of the Newnan Bypass." *Id.* The court properly held that Phase I was merely a segment of an overall project, consisting of both Phase I and Phase II, and the provisions of NEPA were applicable.

In contrast, the segments of the Austin Outer Loop are planned to be constructed if at all at different times in the future over a period of years. It is not one continuous project as anticipated in *Hawthorn.* Further, our review of the record indicates that unlike the state-funded segment of the *Hawthorn* bypass, the partially constructed segment of the Austin Outer Loop, Segment 3, as well as MoPac South, will have substantial independent utility. Together, they will serve a highly useful urban traffic purpose even if no other segments of the Outer Loop are ever constructed.

*San Antonio* is also readily distinguishable on its facts from this case. There, the Secretary of Transportation had approved Texas' request for federal participation, authorization, and financial assistance in a highway project which was to cross San Antonio's Brackenridge Park. The project was challenged for failure to comply with Section 4(f) of the Department of Transportation Act, which generally prohibits, *inter*

*alia,* the use of federal funds to build highways through parks of local significance.[16] The state then decided to divide the project into three segments. The federal government would be asked to fund the two end segments, and the state would fund the middle segment that would actually cross the park. This Court found that the state had impermissibly segmented a highway project running through park lands in order to evade federal environmental regulations. It was deemed significant that segments of the highway on both sides of the park were to be constructed with federal funds, and none of the three segments had logical termini or independent utility. In clear contrast, both the segment of the Austin Outer Loop as well as MoPac South fully comport with both case law and FHWA's regulations requiring that segments have independent utility, connect with logical termini, and do not foreclose the opportunity to consider alternatives.[17]

None of the segments of the proposed Austin Outer Loop are scheduled for simultaneous or continuous construction as anticipated in *Hawthorn* and *San Antonio I.* The appellees have offered no evidence that any segment of the Austin Outer Loop is dependent on any other segment for its utility. The proper question is whether the Segment 3 project serves a significant purpose even if the other related projects, the other segments, are not built for a long time or perhaps not at all. *See Coalition on Sensible Transp. Inc. v. Dole,* 826 F.2d 60, 69 (D.C.Cir.1987) (highway and inter-

---

**16.** Section 4(f), formerly at 49 U.S.C. § 1653(f), was repealed in 1983 when it was codified without substantive change as 49 U.S.C. § 303. *See also* 23 U.S.C. § 138. The policies section 4(f) engendered, however, are still widely referred to as "section 4(f) matters." *See, e.g.,* 23 C.F.R. Part 771 (1991).

**17.** The Austin Outer Loop is more closely analogous to the 3–A system of interstate and primary highways in the City of Baltimore which was the subject of litigation in *Movement Against Destruction v. Volpe,* 361 F.Supp. 1360 (D.Md. 1973) (per curiam), *aff'd per curiam,* 500 F.2d 29 (4th Cir.1974). There, the plaintiffs challenged the FHWA's failure to prepare an EIS prior to its approval of the system plan for interconnected and interdependent highways.

The court recognized that each component of the 3–A system served different functions and provided a useful facility even if the others were not constructed. It held that there was "no 'major [F]ederal action' which treated the 3–A system as a unit, and, therefore, under the plain language of the NEPA no EIS [was] required for the '3–A system' as a whole." *Id.* at 1383. *See also Association Concerned About Tomorrow, Inc. v. Dole,* 610 F.Supp. 1101 (N.D.Tex.1985) (finding that the segmentation of Loop 9 around Dallas County into segments or "legs" was an appropriate decision for the purposes of planning and development, including NEPA analysis; the legs of Loop were not proposed for contemporaneous construction and had significant independent utility).

change projects serve necessary purposes in absence of I–270 expansion and are sufficiently independent); *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 299 (D.C.Cir.1987) (per curiam) (substantial independent utility recognized in a four-mile section of mass transit project originally planned as 18.6 miles); *Piedmont Heights*, 637 F.2d at 440–41 (urban highway projects, although related to overall transportation plan, held to contribute individually to improving traffic conditions).

The contentions of the federal and state officials are sound. Segment 3 satisfies the FHWA's standards for proper segmentation. Segment 3 meets the significant criterion of independent utility. It increases the utility of the existing roadway network by providing effective access between two major radial highways. Segment 3 also will serve local needs. It will provide improved access to business and residential developments and to community and recreational features which will be accessible by intersecting roads. Furthermore, it will relieve traffic on arterial and city streets. Segment 3 also satisfies the logical termini requirement. Its termini are located at nodes of commercial and traffic activity; they were chosen based on population and usage forecasts. Moreover, Segment 3 does not restrict consideration of alternatives. The construction of Segment 3 does not dictate that any other segment must be built, nor does it dictate the size of a segment if built, nor control the alignment of the rest of the Austin Outer Loop.

The appellees contend that the end points of Segment 3 drastically limit "the reasonable alternatives" for the end points of Segments 2 and 4. An answer to this contention is that Segment 3 is a state project to which the requirements of federal regulations do not apply. Assuming the regulations applied, however, Segment 3 would nonetheless comply with them. Segments 2 and 4 may never be built; neither segment is shown to be required to connect with Segment 3 in order to be functional. Even if Segments 2 and 4 were ultimately to connect with Segment 3, alternatives available for their location are many; the regulations require no more.

With regard to MoPac South, the district court ruled that it must comply with NEPA because it "is an extension of a federal project (MoPac), a connection of three federal projects (MoPac, U.S. 290, and the Austin Outer Loop), and it lacks substantial independent utility." But this ruling when placed in its context would mean that every time a state or local government desires to build a non-federal aid highway project (MoPac South) that connects to existing federal highways (MoPac and U.S. 290), the project would be subject to NEPA because it would be "dependent" on the federal facilities. This extrapolation is attenuated at best. All proposed highways, when constructed, must eventually connect to an existing highway. Every roadway section that is added to a highway network is dependent upon and connected to the rest of the network. *See Named Individual Members of San Antonio Conservation Soc'y v. Texas Highway Dep't*, 496 F.2d 1017, 1024 (5th Cir.1974), *cert. denied*, 420 U.S. 926, 95 S.Ct. 1123, 43 L.Ed.2d 396 (1975) (hereinafter *San Antonio (II)*) ("virtually every road in the country crosses or interchanges with federal-aid highways, and ... there are many state-constructed roads which do not form a part of the federal network"). *See also Village of Los Ranchos de Albuquerque*, 906 F.2d at 1483 (" 'Congress has not purported to apply NEPA requirements to [e]very highway that connects with a federally-funded highway' ") (quoting *Citizens for Balanced Env't & Transp., Inc. v. Volpe*, 376 F.Supp. 806, 810 (D.Conn.), *aff'd*, 503 F.2d 601 (2d Cir.1974), *cert. denied*, 423 U.S. 870, 96 S.Ct. 135, 46 L.Ed.2d 100 (1975)).

Ample evidence establishes that the MoPac and U.S. 290 highways have served a useful transportation function for years without the aid of MoPac South. These roads then cannot be the basis for a "lack of independent utility" finding in connection with MoPac South. MoPac South has utility independent from the Austin Outer Loop as well as Segment 3, and has a significant purpose even if the other projects are never built. Currently, as planned, MoPac South will be a limited

access roadway, unlike any north-south roadway in southwest Travis county.

One of MoPac South's significant functions would be achieved regardless of the existence of Segment 3 as its southern terminus. MoPac South will serve local needs by improving the access for Austin residents to such community uses as retail establishments, places of worship, as well as cultural and recreational areas. The logical termini requirement is also satisfied. The north terminus of MoPac South is located at an intersection with U.S. 290, a major east-west highway, and connects with the existing MoPac, a major north-south highway, thus improving the efficiency of all three roadways. Moreover, MoPac South does not foreclose consideration of alternatives. For instance, to appease the concern that MoPac South restricts alternatives because its southern-most point determines the alignment of Segment 3, the state designated Hannon Lane as the alternative southern terminus should Segment 3 not be built.

We have addressed the central question in the challenge of improper segmentation—whether Segment 3 and MoPac South serve significant purposes and have the requisite independent utility. The record clearly indicates that the two projects serve such purposes and are sufficiently independent even in the absence of MoPac, U.S. 290, and the Austin Outer Loop. This Court finds that both Segment 3 and MoPac South would meet the elements enumerated in *Piedmont Heights* to fall outside of NEPA's purview.

Finally, we feel compelled to address the district court's continuous reference to potentially suspect behavior on the part of the state.[18] The federal and state officials to the contrary rely primarily on *Bennett v. Taylor*, 505 F.Supp. 800, 810 n. 4 (M.D.La.1980), stating that, in NEPA suits, "motives of the state authorities are by and large irrelevant to this inquiry since the law applies to those projects specified by the Congress without regard to intent of either state or federal authorities." But the appellees in supporting the court's judgment place much reliance on *Environmental Defense Fund v. Marsh*, 651 F.2d 983, 999 n. 19 (5th Cir. Unit A 1981) to show the relevance of motive in an improper segmentation case. In *Marsh*, we stated that we believed *Kleppe* allows courts "to prohibit segmentation ... if an agency has egregiously or arbitrarily violated the underlying purpose of NEPA." This principle is sound but it does not control this case.

In addressing the issue of motivation, we draw guidance from *Macht v. Skinner*, 715 F.Supp. 1131, 1135 (D.D.C.), *aff'd*, 889 F.2d 291 (D.C.Cir.1989) (Table). There, the district court suggested that the segmentation analysis advocated by *Piedmont* and its progeny has the effect of replacing "a subjective analysis of motivation with a set of objective criteria." Thus, "states are entitled to invoke the segmentation doctrine to insulate their construction projects from federal environmental law, so long as they meet the objective criteria of compliance." According to the court, "this is a legitimate choice for the State to make, and ... requiring [the State] to comply with NEPA simply because it has tried to plan its project so as to *avoid* federal law would be an unfair surprise." *Id.* (emphasis in original). *See also Citizens for Balanced Environ. & Transp., Inc. v. Volpe*, 376 F.Supp. 806, 813 (D.Conn.), *aff'd*, 503 F.2d 601 (2d Cir.1974), *cert. denied*, 423 U.S. 870, 96 S.Ct. 135, 46 L.Ed.2d 100 (1975), in which the court said: "[T]he State's choice should not be restricted simply because one alternative of the option (using state dollars) might result in less adequate assessment of environmental considerations. If the highway is not a federal action, then a state's decision to avoid federal involvement cannot have the paradoxical effect of establishing federal involvement."

We recognize that if a state has segmented for the purpose of evading federal environmental requirements and without

---

18. Comments by the district court included: "TDH's motive for segmenting the portion of the [Austin Outer Loop] which traverses the area most environmentally sensitive is naturally suspect," and "TDH's intentions regarding Segment 3 may have been on the 'up and up'; however, the evidence does not reveal any measurable good will on the State's part."

**1144**

other valid justifications, a holding of evasive violation would be justified. This Court does not "condone any form of subterfuge." *San Antonio I,* 446 F.2d at 1029 (Clark, J., concurring in part and dissenting in part). We have no such case here, and the district court made no findings leading to such a conclusion. Our review of the record reveals no improper segmentation. In this case, the state entertained various options for Segment 3 and MoPac South and concluded that the use of state funds would enable it to proceed without the delays and expenses associated with compliance with federal environmental law.[19] There is nothing in the federal law to compel a state to ask for federal highway aid because there are environmental concerns. States are capable of dealing with environmental matters. Often overlooked is the limited scope of the federal legislation which recognizes this. We find no improper segmentation of a large highway project in this case.

## III. CONCLUSION

Early coordination or compliance with the eligibility requirements for federal funding alone does not constitute a "proposal" for "major Federal action." Where the actions at issue have been taken by the state authorities without substantive federal supervision, authorization, commitment, or control, and will never be subject to review or approval by a federal agency, there can be no finding of "major Federal action" within the meaning of NEPA. With no control, right to control, or even the prerogative to suggest compliance with federal standards by FHWA, we find that the projects at issue are state projects. Both the state and federal governments agree. In this case, the state did not voluntarily submit itself to federal law. Further, there is no showing that the state segmented a larger project for the pur-

poses of circumventing the application of federal law.

We reverse the judgment of the trial court and rule that both Segment 3 of the proposed Austin Outer Loop and MoPac South are state projects not subject to the requirements of NEPA.

REVERSED.

INJUNCTION DISSOLVED.

---

**19.** The evidence most relied upon by appellants in undertaking to establish improper motive in segmentation includes a portion from the Corporation's Technical Brief to the TDH and a letter from the Corporation's primary developer to an earlier TDH Chairman. In each instance appellees omitted following language that re-

vealed clear concern by the TDH as to environmental matters and statements that the state planned its own environmental evaluations. The statement also indicated a need for expedited action and avoidance of long drawn-out federal proceedings—a valid state concern. *See Macht v. Skinner,* 715 F.Supp. at 1135.